**BIG MAMA RAG, INC., a Colorado nonprofit corporation, Appellant,**

v.

**UNITED STATES of America et al.**

No. 79–1826.

United States Court of Appeals, District of Columbia Circuit.

Argued June 9, 1980.

Decided Sept. 15, 1980.

---

Robert Jenkins, III, Washington, D. C., for appellant. Jeffrey L. Yablon, Washington, D. C., was on the brief for appellant. Harris Weinstein, Washington, D. C., also entered an appearance for appellant.

Robert A. Bernstein, Atty., Dept. of Justice, Washington, D. C., with whom M. Carr Ferguson, Asst. Atty. Gen., Carl S. Rauh, U. S. Atty., Washington, D. C., at the time the brief was filed, were on the brief, for appellee.

Before TAMM, ROBINSON, and MIKVA, Circuit Judges.

Opinion for the Court filed by Circuit Judge MIKVA.

MIKVA, Circuit Judge:

Plaintiff, Big Mama Rag, Inc. (BMR, Inc.), appeals from the order of the court below granting summary judgment to defendants [1] and upholding the IRS's rejection of plaintiff's application for tax–exempt status. Specifically, BMR, Inc. questions the finding that it is not entitled to tax exemption as an educational or charitable organization under section 501(c)(3) of the Internal Revenue Code, 26 U.S.C. § 501(c)(3) (1976), and Treas.Reg. § 1.501(c)(3)–1(d)(2) & (3) (1959). Appellant also challenges the constitutionality of the regulatory scheme, arguing that it violates the First Amendment and the equal protection component of the Fifth Amendment and that it unconstitutionally conditions tax–exempt status on the waiver of constitutional rights.

Because we find that the definition of "educational" contained in Treas. Reg. § 1.501(c)(3)–1(d)(3) is unconstitutionally vague in violation of the First Amendment, we reverse the order of the court below.

## I. BACKGROUND

BMR, Inc. is a nonprofit organization with a feminist orientation. Its purpose is "to create a channel of communication for women that would educate and inform them on general issues of concern to them." App. 76. To this end, it publishes a monthly newspaper, *Big Mama Rag (BMR)*, which prints articles, editorials, calendars of events, and other information of interest to women. BMR, Inc.'s primary activity is the production of that newspaper, but it also devotes a considerable minority of its time to promoting women's rights through workshops, seminars, lectures, a weekly radio program, and a free library.

BMR, Inc. has a predominantly volunteer staff and distributes free approximately 2100 of 2700 copies of *Big Mama Rag's* monthly issues. Moreover, the organization has severely limited the quantity and type of paid advertising. As the district court found, BMR, Inc. neither makes nor intends to make a profit and is dependent on contributions, grants, and funds raised by benefits for over fifty percent of its income. 494 F.Supp. 473, 476 (D.D.C.1979).

Because of its heavy reliance on charitable contributions, BMR, Inc. applied in 1974 for tax–exempt status as a charitable and educational institution.[2] That request was

---

1. Defendants in this case are the United States, W. Michael Blumenthal, as Secretary of the Treasury, and Jerome Kurtz, as Commissioner of IRS.

2. Tax–exempt status is desirable for two reasons: the profits of exempt corporations are not subject to federal income tax, 26 U.S.C. § 501(a) (1976); and contributions to the or-

first denied by the IRS District Director in Austin, Texas, on the ground that the organization's newspaper was indistinguishable from an "ordinary commercial publishing practice."[3] After BMR, Inc. filed a protest and a hearing was held in the IRS National Office, the denial of tax–exempt status was affirmed on three separate grounds:

1. the commercial nature of the newspaper;

2. the political and legislative commentary found throughout; and

3. the articles, lectures, editorials, etc., promoting lesbianism.

App. 1030.

To enable BMR, Inc. to obtain judicial review of the IRS decision, the IRS District Director issued a final determination letter, which denied tax–exempt status on the grounds that, *inter alia,* the content of *BMR* was not educational and the manner of

ganization are tax deductible, 26 U.S.C. § 170(c) (1976). Appellant, which does not expect to make a profit and is heavily subsidized by contributions, seeks tax–exempt status for the second reason.

3. The District Director's letter to BMR, Inc. stated:

Based on the information submitted, it appears that your corporate activities, which presumably are within the charter powers, are business activities. They are devoted to publishing a newspaper and selling it to the general public in accordance with ordinary commercial publishing practices. Although the newspaper published articles expressing the Feminist point of view, there is no showing that the operations fulfill a corporate role which in and of itself is exclusively charitable, scientific, literary or educational.

App. 77–78.

4. The District Director's reasoning stated in full:

The organization in publishing the newspaper is not operated exclusively for educational purposes as required by Code section 501(c)(3) as the content of the publication is not educational, the preparation of the material does not follow methods educational in nature, the distribution of the material is not valuable in achieving an educational purpose and/or the manner in which the distribution is accomplished is not distinguishable from ordinary commercial publishing practices.

App. 14.

distribution was that of ordinary commercial publishing organizations.[4]

Appellant then brought a declaratory judgment action in the District Court for the District of Columbia.[5] On cross–motions for summary judgment, the judge granted appellees' motion. Although the court rejected appellees' argument that BMR, Inc. was not entitled to tax–exempt status because it was a commercial organization, it agreed that appellant did not satisfy the definitions of "educational" and "charitable" in Treas.Reg. § 1.501(c)(3)–1(d)(2) & (3). The court found no constitutional basis for disturbing the IRS's decision.

## II. THE REGULATORY SCHEME

Tax exemptions are granted under section 501(c) of the Internal Revenue Code to a variety of socially useful organizations, including the charitable and the educational.[6] The Code forbids exemption of an or-

5. *See* 26 U.S.C. § 7428 (1976) (providing for declaratory judgment action in federal district court for determination of tax–exempt status).

6. Section 501(c) provides in relevant part:

The following organizations are referred to in subsection (a) [which grants exemption]:

. . . . .

(3) Corporations, and any community chest, fund, or foundation, organized and operated exclusively for religious, charitable, scientific, testing for public safety, literary, or educational purposes, or to foster national or international amateur sports competition (but only if no part of its activities involve the provision of athletic facilities or equipment), or for the prevention of cruelty to children or animals, no part of the net earnings of which inures to the benefit of any private shareholder or individual, no substantial part of the activities of which is carrying on propaganda, or otherwise attempting, to influence legislation (except as otherwise provided in subsection (h)), and which does not participate in, or intervene in (including the publishing or distributing of statements), any political campaign on behalf of any candidate for public office.

26 U.S.C. § 501(c) (1976).

ganization if any part of its net earnings inures to the benefit of private persons or if it is an "action organization"–one that attempts to influence legislation or participates in any political campaign. Treasury regulations impose additional requirements: exempt status is accorded only to applicants whose articles of organization limit their activities to furtherance of exempt purposes (the "organizational test") or whose activities are in fact aimed at accomplishment of exempt purposes (the "operational test"). Treas.Reg. § 1.501(c)(3)–1(b) & (c) (1959).

The Treasury regulations also define some of the exempt purposes listed in section 501(c)(3) of the Code, including "charitable" and "educational." The definition of "educational" is the one at issue here:

> The term "educational," as used in section 501(c)(3), relates to—
>
> (a) The instruction or training of the individual for the purpose of improving or developing his capabilities; or
>
> (b) The instruction of the public on subjects useful to the individual and beneficial to the community.
>
> An organization may be educational even though it advocates a particular position or viewpoint so long as it presents a sufficiently full and fair exposition of the pertinent facts as to permit an individual or the public to form an independent opinion or conclusion. On the other hand, an organization is not educational if its principal function is the mere presentation of unsupported opinion.

Treas.Reg. § 1.501(c)(3)–1(d)(3)(i) (1959).

The district court found that BMR, Inc. was not entitled to tax–exempt status because it had "adopted a stance so doctrinaire" that it could not meet the "full and fair exposition" standard articulated in the definition quoted above. Appellant's response is threefold. First, it argues, the

"full and fair exposition" hurdle is not applicable at all here because BMR, Inc. is not an organization whose primary activity or principal function is advocacy of change. Second, BMR, Inc. contends that its publication does satisfy the requirements of the "full and fair exposition" standard. Finally, appellant maintains that denial of its application for tax–exempt status on the basis of the "full and fair exposition" standard is unconstitutional for a number of reasons.

 Even though tax exemptions are a matter of legislative grace, the denial of which is not usually considered to implicate constitutional values, tax law and constitutional law are not completely distinct entities. In fact, the First Amendment was partly aimed at the so–called "taxes on knowledge," which were intended to limit the circulation of newspapers and therefore the public's opportunity to acquire information about governmental affairs. *See Grosjean v. American Press Co.,* 297 U.S. 233, 246–49, 56 S.Ct. 444, 447–48, 80 L.Ed. 660 (1936). In light of their experience with such taxes, the framers realized, in the words of Mr. Justice Douglas, that "[t]he power to tax the exercise of a privilege is the power to control or suppress its enjoyment." *Murdock v. Pennsylvania,* 319 U.S. 105, 112, 63 S.Ct. 870, 874, 87 L.Ed. 1292 (1943). Thus, although First Amendment activities need not be subsidized by the state, the discriminatory denial of tax exemptions can impermissibly infringe free speech. *Speiser v. Randall,* 357 U.S. 513, 518, 78 S.Ct. 1332, 1338, 2 L.Ed. 1460 (1958). Similarly, regulations authorizing tax exemptions may not be so unclear as to afford latitude for subjective application by IRS officials.[7] We find that the definition of "educational," and in particular its "full and fair exposition" requirement, is so vague as to violate the First Amendment

---

7. *Cammarano v. United States,* 358 U.S. 498, 79 S.Ct. 524, 3 L.Ed.2d 462 (1959), is not to the contrary. There the Court upheld Treasury regulations prohibiting business deductions of lobbying expenses. These "nondiscriminatory"

provisions, intended to put "everyone in the community . . . on the same footing," *id.* at 513, 79 S.Ct. at 533, are very different from the regulations at issue here, which leave room for discriminatory denial of tax–exempt status.

and to defy our attempts to review its application in this case.[8]

## III. VAGUENESS ANALYSIS

■ Vague laws are not tolerated for a number of reasons, and the Supreme Court has fashioned the constitutional standards of specificity with these policies in mind. First, the vagueness doctrine incorporates the idea of notice—informing those subject to the law of its meaning. *Smith v. Goguen*, 415 U.S. 566, 572, 94 S.Ct. 1242, 1246, 39 L.Ed.2d 605 (1974); *Grayned v. City of Rockford*, 408 U.S. 104, 108, 92 S.Ct. 2294, 2298, 33 L.Ed.2d 222 (1972). A law must therefore be struck down if " 'men of common intelligence must necessarily guess at its meaning.' " *Hynes v. Mayor of Oradell*, 425 U.S. 610, 620, 96 S.Ct. 1755, 1760, 48 L.Ed.2d 243 (1976) (quoting *Connally v. General Constr. Co.*, 269 U.S. 385, 391, 46 S.Ct. 126, 127, 70 L.Ed. 322 (1926)). *See also Baggett v. Bullitt*, 377 U.S. 360, 367, 84 S.Ct. 1316, 1320, 12 L.Ed.2d 377 (1964).

■ Second, the doctrine is concerned with providing officials with explicit guidelines in order to avoid arbitrary and discriminatory enforcement. *Hynes*, 425 U.S. at 622, 96 S.Ct. at 1761; *Goguen*, 415 U.S. at 572–73, 94 S.Ct. at 1246–47; *Papachristou v. City of Jacksonville*, 405 U.S. 156, 170, 92 S.Ct. 839, 847, 31 L.Ed.2d 110 (1972). To that end, laws are invalidated if they are "wholly lacking in 'terms susceptible of objective measurement.' " *Keyishian v. Board of Regents*, 385 U.S. 589, 604, 87 S.Ct. 675, 684, 17 L.Ed.2d 629 (1967) (quoting *Cramp v. Board of Public Instruction*, 368 U.S. 278, 286, 82 S.Ct. 275, 280, 7 L.Ed.2d 285 (1961)). *See also NAACP v. Button*, 371 U.S. 415, 466, 83 S.Ct. 328, 355, 9 L.Ed.2d 405 (1963) (Harlan, J., dissenting) ("Laws that have failed to meet this [vagueness] standard are, almost without exception, those which turn on language calling for the exercise of subjective judgment, unaided by objective norms.").

These standards are especially stringent, and an even greater degree of specificity is required, where, as here, the exercise of First Amendment rights may be chilled by a law of uncertain meaning. *Hynes*, 425 U.S. at 620, 96 S.Ct. at 1760; *Goguen*, 415 U.S. at 573, 94 S.Ct. at 1247; *NAACP v. Button*, 371 U.S. at 432–33, 83 S.Ct. at 337–38. Vague laws touching on First Amendment rights, noted the Supreme Court in *Baggett*,

> require [those subject to them] to "steer far wider of the unlawful zone," than if the boundaries of the forbidden areas were clearly marked, . . . . by restricting their conduct to that which is unquestionably safe. Free speech may not be so inhibited.

377 U.S. at 372, 84 S.Ct. at 1323 (quoting *Speiser v. Randall*, 357 U.S. 513, 526, 78 S.Ct. 1332, 1342, 2 L.Ed.2d 1460 (1958)) (citation omitted). Measured by any standard, and especially by the strict standard that must be applied when First Amendment rights are involved, the definition of "educational" contained in Treas.Reg. § 1.501(c)(3)–1(d)(3) must fall because of its excessive vagueness.

We do not minimize the difficulty and delicacy of the task delegated to the Treasury by Congress under section 501(c)(3) of the Code. Words such as "religious," "charitable," "literary," and "educational" easily lend themselves to subjective definitions at odds with the constitutional limitations we describe above. Treasury bravely made a pass at defining "educational," but the more parameters it tried to set, the more problems it encountered.

The first portion of the regulation relied upon to deny BMR, Inc.'s request for tax–exempt status measures an applicant organization by whether it provides "instruction of the public on subjects useful to the individual and beneficial to the community."

---

8. Given this disposition of the case, we do not, and need not, address the other issues raised by appellant: that the organization satisfies the requirements of Treas.Reg. § 1.501(c)(3)–1(d)(2) & (3) and is therefore entitled to tax–ex-empt status; that the regulation is violative of equal protection; and that exemption is unconstitutionally conditioned on the waiver of constitutional rights.

Treas.Reg. § 1.501(c)(3)–1(d)(3)(i)(b) (1959). The district court rejected that test with barely a murmur of disagreement from appellees. That standard, held the court below, "would be far too subjective in its application to pass constitutional muster." 494 F.Supp. at 479 n.6.

We find similar problems inherent in the "full and fair exposition" test, on which the district court based affirmance of the IRS's denial of tax–exempt status to BMR, Inc. That test lacks the requisite clarity, both in explaining which applicant organizations are subject to the standard and in articulating its substantive requirements.

## A. Who is Covered by the "Full and Fair Exposition" Test?

According to the terms of the Treasury regulation, only an organization that "advocates a particular position or viewpoint" must clear the "full and fair exposition" hurdle. Appellant maintains that the definition of an advocacy organization is to be found in the preceding subsection of the regulation, which defines the term "charitable":

> The fact that an organization, in carrying out its primary purpose, advocates social or civic changes or presents opinion on controversial issues with the intention of molding public opinion or creating public sentiment to an acceptance of its views does not preclude such organization from qualifying under section 501(c)(3) so long as it is not an "action" organization of any one of the types described in paragraph (c)(3) of this section.

Treas.Reg. § 1.501(c)(3)–1(d)(2) (1959). The district court held that this part of the regulation was designed to cover charitable institutions and that BMR, Inc., an educational rather than a charitable organization,

must meet the "full and fair exposition" standard rather than the more lenient "action organization" standard of section 1.501(c)(3)–1(d)(2).[9] Obviously, if BMR, Inc. is an advocacy group and is not a charitable organization, it may not take cover under the "action organization" standard but must instead meet the "full and fair exposition" test.

The initial question, however, is whether or not BMR, Inc. is an advocacy group at all. What appellant turns to Treas.Reg. § 1.501(c)(3)–1(d)(2) for is the definition of "advocacy," not for the appropriate standard to be applied to advocacy organizations seeking tax–exempt status. The district court did not deal with that question, and, indeed, it is difficult to ascertain from the language of the regulation defining "educational" exactly what organizations are intended to be covered by the "full and fair exposition" standard and whether or not the definitions of advocacy groups are the same for both educational and charitable organizations.[10]

The uncertainty of the coverage of the "full and fair exposition" standard is evidenced by its application over the years by the IRS. The Treasury Department's Exempt Organizations Handbook has defined "advocates a particular position" as synonymous with "controversial." [11] Such a gloss clearly cannot withstand First Amendment scrutiny. It gives IRS officials no objective standard by which to judge which applicant organizations are advocacy groups–the evaluation is made solely on the basis of one's subjective notion of what is "controversial." And, in fact, only a very few organizations, whose views are not in the mainstream of political thought, have been deemed advocates and held to the "full and

---

9. An action organization is one that tries to influence legislation or participates in any political campaign. *See* 26 U.S.C. § 501(c)(3) (1976), quoted in full in note 6 *supra*.

10. For a comprehensive discussion of the ambiguous relationship between the definitions of "educational" and "charitable" in the Treasury regulations, see Comment, *Tax Exemptions for Educational Institutions: Discretion and Dis-*

*crimination*, 128 U.Pa.L.Rev. 849, 862–66 (1980) [hereinafter cited as U.Pa.Comment].

11. "Organizations doing research or educating the public on controversial public issues must stick to the reasoned approach and avoid unsupported opinion." 3 Int.Rev.Manual–Admin. (CCH) pt. 7751, § 345.(12), at 20,572 (Apr. 28, 1977).

fair exposition" standard.[12] The one tax-exempt homosexual organization cited by the Government as evidence that the IRS does not discriminate on the basis of sexual preference was required to meet the "full and fair exposition" standard even though it admittedly did not "advocate or seek to convince individuals that they should or should not be homosexuals." Rev.Rul. 78–305, 1978–2 C.B. 172, 173.

■ The Treasury regulation defining "educational" is, therefore, unconstitutionally vague in that it does not clearly indicate which organizations are advocacy groups and thereby subject to the "full and fair exposition" standard. And the latitude for subjectivity afforded by the regulation has seemingly resulted in selective application of the "full and fair exposition" standard—one of the very evils that the vagueness doctrine is designed to prevent.

B. *What Does the "Full and Fair Exposition" Test Require?*

■ The Treasury definition of "educational" may also be challenged on the ground that it fails to articulate with sufficient specificity the requirements of the "full and fair exposition" standard. The language of the regulation gives no aid in interpreting the meaning of the test:

> An organization may be educational even though it advocates a particular position or viewpoint so long as it presents a sufficiently full and fair exposition of the pertinent facts as to permit an individual or the public to form an independent opinion or conclusion. On the other hand, an organization is not educational if its principal function is the mere presentation of unsupported opinion.

Treas.Reg. § 1.501(c)(3)–1(d)(3) (1959). What makes an exposition "full and fair"?

Can it be "fair" without being "full"? Which facts are "pertinent"? How does one tell whether an exposition of the pertinent facts is "sufficient . . . to permit an individual or the public to form an independent opinion or conclusion"? And who is to make all of these determinations?

■ The regulation's vagueness is especially apparent in the last clause quoted above. That portion of the test is expressly based on an individualistic–and therefore necessarily varying and unascertainable–standard: the reactions of members of the public. The Supreme Court has recognized that statutes phrased in terms of individual sensitivities are suspect and susceptible to attack on vagueness grounds. *See Coates v. City of Cincinnati*, 402 U.S. 611, 614, 91 S.Ct. 1686, 1688, 29 L.Ed.2d 214 (1971) ("Conduct that annoys some people does not annoy others. Thus, the ordinance is vague . . . in the sense that no standard of conduct is specified at all."). *See also Kingsley Int'l Pictures Corp. v. Regents of the Univ. of New York*, 360 U.S. 684, 701–02, 79 S.Ct. 1362, 1372, 3 L.Ed.2d 1512 (1959) (Clark, J., concurring in the result); *Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495, 504–05, 72 S.Ct. 777, 781–82, 96 L.Ed. 1098 (1952).

An additional source of unclarity lies in the relationship between the two sentences comprising the "full and fair exposition" test. Appellant argues that the two should be read as counter–examples–an organization fails to satisfy the test only if "its principal function is the mere presentation of unsupported opinion." The Government, on the other hand, contends that tax–exempt status must be denied BMR, Inc. if a substantial portion of its newspaper consists of unsupported opinion. Again, the language of the regulation does not resolve this issue.[13]

---

**12.** For a discussion of these applications of the "full and fair exposition" standard, see U.Pa. Comment, *supra* note 10, at 858–59.

**13.** The IRS has adopted a list of specific guidelines to implement the Treasury definition of "educational." But those guidelines use the same conclusory terms as the regulation and are not helpful in clarifying its meaning:

> An organization . . . may qualify . . . if (1) the content of the publication is educational, (2) the preparation of material follows methods generally accepted as "educational" in character, (3) the distribution of the materials is necessary or valuable in achieving the organization's educational and scientific purposes, and (4) the manner in which the distribution is accomplished is distinguishable

The district court's interpretation of the "full and fair exposition" test, and the one advocated by the Government, is no more precise. The district court found the Treasury regulation "capable of objective application" because "it asks only whether the facts underlying the conclusions are stated." 494 F.Supp. at 480. But distinguishing facts, on the one hand, and opinion or conclusion, on the other, does not provide an objective yardstick by which to define "educational." The distinction is not so clear-cut that an organization seeking tax–exempt status–or an IRS official reviewing an application for exemption–will be able to judge when any given statement must be bolstered by another supporting statement.[14]

One of the five examples cited by the Government as evidence of *BMR*'s failure to meet the "full and fair exposition" test may be used to illustrate our point. Most of the article, discussing Susan Saxe's 1975 plea of guilty to charges stemming from a bank robbery in Philadelphia, is simple journalistic reporting. It discusses the terms of the plea bargain, the reaction of local feminists, the differential treatment accorded Saxe supporters and white men who went to observe the pretrial hearing, and police questioning of women in Philadelphia. In return for Saxe's plea, the Government apparently agreed, among other things, to "call off its investigation of the women's and lesbian communities" in the area and not to ask Saxe to testify against "anyone she has known or know [sic] about in the last five years." By forcing Saxe to choose between her own interests and those of other women, the article continues, "the Government has clarified for us, once again, that we, as women, are inextricably bound up with each other in the struggle." *Big*

Mama Rag, July, 1975, at 1, cols. 1–3, *reprinted in* App. 447.

Certainly, the author's viewpoint is not disguised in the last sentence. But is the statement one of fact or opinion? If the latter, is the author's description of the terms of the guilty plea sufficient to inform readers of the basis underlying her opinion? Or is further proof of the existence of "the struggle" necessary? If so, would the article satisfy the "full and fair exposition" test without that final statement? Neither the Treasury regulation nor the proposed fact/opinion distinction is responsive to these questions. And one's answers will likely be colored by one's attitude towards the author's point of view.[15]

The futility of attempting to draw lines between fact and unsupported opinion is further illustrated by the district court's application of that test. The court did not analyze the contents of *BMR* under its proposed test but merely stated, without further explication, that the publication was not entitled to tax–exempt status because it had "adopted a stance so doctrinaire that it cannot satisfy this standard." 494 F.Supp. at 479. Instead of applying the purportedly objective test the court had formulated, it was forced to resolve the case by resorting to the subjective notion of whether the publication was "doctrinaire." We can conceive of no value–free measurement of the extent to which material is doctrinaire, and the district court's reliance on that evaluative concept corroborates for us the impossibility of principled and objective application of the fact/opinion distinction.

Appellees suggest that the Treasury regulation at issue here embodies a related distinction–between appeals to the emotions

from ordinary commercial publishing practices.
Rev.Rul. 67–4, 1967–1 C.B. 121, 122; *see* Rev. Rul. 77–4, 1977–1 C.B. 141.

**14.** Moreover, we fail to understand the preoccupation of the district court and the IRS with facts, statistics, surveys, and such, which can be easily distorted and therefore of questionable educational value.

**15.** Ironically, an article appearing in the same issue of *BMR* as the Saxe piece criticizes another feminist group, which had accused Gloria Steinem of collaborating with the CIA, for "slant[ing] the information it presents in such a way as to make certain conclusions inevitable, rather than presenting the facts and leaving the reader to reach her own conclusions." *Big Mama Rag*, July, 1975, at 5, cols. 1, 4, *reprinted in* App. 451.

and appeals to the mind.[16] Material is educational, they argue, if it appeals to the mind, that is, if it reasons to a conclusion from stated facts. Again, the required line-drawing is difficult, a problem which is compounded if the difference between the two relies on the aforementioned fact/opinion distinction.

Moreover, the Treasury regulation does not support such a narrow concept of "educational" and we cannot approve it. Nowhere does the regulation hint that the definition of "educational" is to turn on the fervor of the organization or the strength of its language. As the Supreme Court has recognized in another context, the emotional content of a word is an important component of its message. *See Cohen v. California*, 403 U.S. 15, 26, 91 S.Ct. 1780, 1788, 29 L.Ed.2d 284 (1971).[17]

An example raised by appellees in their brief and discussed at oral argument is illustrative. The American Cancer Society's cause may be better served by a bumper sticker picturing a skull and crossbones and saying "Smoking rots your lungs" than by one that merely states "Smoking is hazardous to your health." Both are intended to impart the same message, and they are identical in degree of specificity of the underlying facts. Although the first may be said to appeal more to the emotions, and the second to the mind, that distinction should not obscure the similarities between the two. They should be considered equal in educational content.

Even if one could in fact differentiate fact from unsupported opinion, or emotional appeals from appeals to the mind, these proposed distinctions would be inadequate definitions of "educational" because material often combines elements of each. In such cases, appellees suggested at oral argument, a quantitative test would be appropriate. But the Treasury regulation makes no mention of such a test. Even if a quantitative approach were authorized, it is unclear how much of a publication's content would have to be factual, or appeal to the mind, in order to satisfy the "full and fair exposition" standard. Also unanswered is who would apply the test and determine the requisite amount of factual material. Certainly, the Treasury regulation itself gives no clue.[18]

Thus, neither of the distinctions proposed here remedies the imprecise language of the "full and fair exposition" standard or clarifies the requirements imposed by that test.

## IV. CONCLUSION

The definition of "educational" contained in Treas.Reg. § 1.501(c)(3)–1(d)(3) lacks sufficient specificity to pass constitutional muster. Its "full and fair exposition" standard, on the basis of which the denial of BMR, Inc.'s application for tax exemption was upheld by the court below, is vague both in describing who is subject to that test and in articulating its substantive requirements.

---

**16.** The court below also seemed to endorse this distinction: it read the Treasury regulation as requiring that a publication be "sufficiently *dispassionate* as to provide its readers with the factual basis from which they may draw independent conclusions." 494 F.Supp. at 479 (emphasis supplied). One can only speculate how a poetry publication would be classified under such a dichotomy.

**17.** Our broad reading of "educational" comports with similarly flexible interpretations of the Treasury regulation. *See, e. g., Lions Associated Drag Strip v. United States*, 64–1 U.S. Tax Cas. ⸿ 9283 (S.D.Cal.1964) (automobile drag strip); *Mobile Arts & Sports Ass'n v. United States*, 148 F.Supp. 311 (S.D.Ala.1957) (football halftime shows); Rev.Rul. 67–216,

1967–2 C.B. 180 (county fair); Rev.Rul. 65–271, 1965–2 C.B. 161 (jazz festivals); Rev.Rul. 64–275, 1964–2 C.B. 142 (sailboat racing instructions).

**18.** In addition to advancing the two distinctions discussed above to elucidate the Treasury's definition of "educational," appellees also rely on the notion of onesidedness. They point to *BMR's* editorial policy of "not print[ing] any material which, by our judgment, does not affirm our struggle." *Big Mama Rag*, Sept., 1976, at 4, col. 2, *reprinted in* App. 667. We agree with the court below that the Treasury regulation may not be read to compel an educational organization to "present views inimical to its philosophy." 494 F.Supp. at 479.

The history of appellant's application for tax–exempt status attests to the vagueness of the "full and fair exposition" test and evidences the evils that the vagueness doctrine is designed to avoid. The district court's decision was based on the value–laden conclusion that *BMR* was too doctrinaire. Similarly, IRS officials earlier advised appellant's counsel that an exemption could be approved only if the organization "agree[d] to abstain from advocating that homosexuality is a mere preference, orientation, or propensity on par with heterosexuality and which should otherwise be regarded as normal." App. 1030. Whether or not this view represented official IRS policy is irrelevant. It simply highlights the inherent susceptibility to discriminatory enforcement of vague statutory language.

█ We are sympathetic with the IRS's attempt to safeguard the public fisc by closing revenue loopholes. And we by no means intend to suggest that tax–exempt status must be accorded to every organization claiming an educational mantle. Applications for tax exemption must be evaluated, however, on the basis of criteria capable of neutral application. The standards may not be so imprecise that they afford latitude to individual IRS officials to pass judgment on the content and quality of an applicant's views and goals and therefore to discriminate against those engaged in protected First Amendment activities.[19]

We are not unmindful of the burden involved in reformulating the definition of "educational" to conform to First Amendment requirements. But the difficulty of the task neither lessens its importance nor warrants its avoidance. Objective standards are especially essential in cases such as this involving those espousing nonmajoritarian philosophies. In this area the First Amendment cannot countenance a subjective "I know it when I see it" standard.[20] And neither can we.

This case is accordingly reversed and remanded for further proceedings consistent with this opinion.

*Reversed and remanded.*

---

19. Moreover, the infrequent use of the "full and fair exposition" standard to deny tax–exempt status, *see* text accompanying note 12 *supra* –as well as the IRS's approval of educational tax exemptions for a broad range of institutions, *see* note 17 *supra* –points up not only the standard's discriminatory potential but also its apparent unimportance to revenue concerns.

For a critical evaluation of the fiscal considerations allegedly justifying the "full and fair exposition" test, see U.Pa. Comment, *supra* note 10, at 881–82.

20. *See Jacobellis v. Ohio*, 378 U.S. 184, 197, 84 S.Ct. 1676, 1683, 12 L.Ed.2d 793 (1964) (Stewart, J., concurring).