NATIONAL ALLIANCE, Appellant

v.

UNITED STATES of America, et al.

NATIONAL ALLIANCE

v.

UNITED STATES of America, et al., Appellants.

Nos. 81–1899, 81–1900.

United States Court of Appeals, District of Columbia Circuit.

Argued June 2, 1982.

Decided June 28, 1983.

Kristina E. Harrigan, Atty., U.S. Dept. of Justice, of the bar of the Supreme Court of California, pro hac vice, by special leave of court, with whom Glenn L. Archer, Jr., Asst. Atty. Gen., Stanley S. Harris, U.S. Atty., and Michael L. Paup, Atty., U.S. Dept. of Justice, Washington, D.C., were on brief, for United States, et al. John F. Murray, Atty., U.S. Dept. of Justice, Washington, D.C., also entered an appearance for United States.

Janet L. McDavid, with whom Sara-Ann Determan and Arthur B. Spitzer, Washington, D.C., were on the brief, for Nat. Alliance. Joseph M. Hassett, Washington, D.C., also entered an appearance for Nat. Alliance.

Paul S. Berger, Walter J. Rockler, and Thomas C. Spring, Washington, D.C., were on brief for amici curiae American Jewish Congress, et al., urging reversal with directions to dismiss.

Before TAMM, Circuit Judge, and THOMAS E. FAIRCHILD,* Senior Circuit Judge for the Seventh Circuit, and ROBB,** Senior Circuit Judge.

Opinion for the court filed by Senior Circuit Judge FAIRCHILD.

FAIRCHILD, Senior Circuit Judge:

On July 28, 1977, National Alliance applied to the IRS for a tax exemption as a charitable and educational institution under 26 U.S.C. § 501(c)(3).[1] The IRS District Director in Arlington, Virginia denied the corporation's application on March 31, 1978, concluding that National Alliance was neither "charitable" nor "educational" as those terms are applied by Treas.Reg. § 1.501(c)(3)–(1)(d)(2) & (3).

National Alliance, a Virginia corporation, publishes a monthly newsletter and membership bulletin, organizes lectures and meetings, issues occasional leaflets, and distributes books; all for the stated purpose of arousing in white Americans of European ancestry "an understanding of and a pride in their racial and cultural heritage and an awareness of the present dangers to that heritage." The Treasury Regulation sometimes said to "define" the statutory term "educational" provides that:

"[a]n organiation may be educational even though it advocates a particular position or viewpoint so long as it presents a sufficiently full and fair exposition of the pertinent facts as to permit an individual or the public to form an independent opinion or conclusion. On the other hand, an organization is not educational it its principal function is the

---

* Sitting by designation pursuant to 28 U.S.C. § 294(d) (1976).

** Senior Circuit Judge Robb participated in the argument of these cases but did not participate in the disposition.

1. Section 501(c)(3) lists the following organizations as among those exempt from taxation under 26 U.S.C. § 501(a):

 Corporations, and any community chest, fund, or foundation, organized and operated exclusively for religious, charitable, scientific, testing for public safety, literary, or educational purposes, or to foster national or international amateur sports competition (but only if no part of its activities involve the provision of athletic facilities or equipment), or for the prevention of cruelty to children or animals, no part of the net earnings of which inures to the benefit of any private shareholder or individual, no substantial part of

the activities of which is carrying on propaganda, or otherwise attempting to influence legislation (except as otherwise provided in subsection (h)), and which does not participate in, or intervene in (including the publishing or distributing of statements), any political campaign on behalf of any candidate for public office.

26 U.S.C. § 501(c)(3) (1976).

In addition to exempting the organization's profits from federal income tax, classification as tax-exempt under this section has other tax advantages. First, and perhaps most important to organizations like National Alliance, contributions to a § 501(c)(3) organization are tax deductible. 26 U.S.C. § 170(c). Second, expenditures by private foundations in the form of grants to § 501(c)(3) organizations are not subject to tax. 26 U.S.C. § 4945(d)(5). Third, these organizations are exempt from federal social security taxes, id. § 3121(a), and from federal unemployment taxes, id. § 3306.

mere presentation of unsupported opinion." [2]

The District Director's proposed determination letter quoted extensively from National Alliance publications, and concluded they fell substantially short of satisfying this "full and fair exposition" standard.[3]

National Alliance appealed the District Director's proposed determination letter arguing that the refusal to grant its application for tax-exempt status was based on the content of its publications in violation of the First Amendment. An Assistant Regional Commissioner denied the appeal on January 12, 1979. The IRS issued a final adverse determination letter on April 23, 1979. Having exhausted its available administrative remedies, National Alliance filed suit in federal district court for declaratory judgment pursuant to 26 U.S.C. § 7428.

The parties filed cross-motions for summary judgment.

This court had then recently decided *Big Mama Rag, Inc. v. United States,* 631 F.2d 1030 (D.C.Cir.1980). This court there reversed a judgment upholding a denial of tax exemption, and held the IRS regulation defining the term "educational" unconstitutionally vague. The regulation in effect at the time of the IRS National Alliance decision was the same regulation held unconstitutional in *Big Mama.* In argument before the district court, the IRS presented four criteria which it designated the Methodology Test, contended the Methodology Test was an explanatory gloss to the "full and fair exposition" test held vague in *Big Mama,* and argued that National Alliance material was not "educational" under the Methodology Test.[4]

The district court concluded that the Methodology Test was itself vague and would not cure the faults of the regulation found in *Big Mama.*[5] The court entered judgment vacating the IRS determination that National Alliance is not entitled to tax

---

**2.** Treas.Reg. § 1.501(c)(3)–1)d)(3)(i) provides in full:

> The term "educational," as used in section 501(c)(3), relates to—
> (a) The instruction or training of the individual for the purpose of improving or developing his capabilities; or
> (b) The instruction of the public on subjects useful to the individual and beneficial to the community.
> An organization may be educational even though it advocates a particular position or viewpoint so long as it presents a sufficiently full and fair exposition of the pertinent facts as to permit an individual or the public to form an independent opinion or conclusion. On the other hand, an organization is not educational if its principal function is the mere presentation of unsupported opinion.

**3.** The letter concluded in part that:

> The contents of most of the articles do not appear to be based on anything more than mere opinion and incomplete information. It appears that your publications are being used as an outlet by your organization to spread its racial propaganda which is often inflammatory and unsupported opinion under the guise of being educational. Moreover, the tone and subject matter potentially serves to influence the prejudices and passions of its readers and the opinions of its creators.
>
> . . . .
>
> Your organization has not presented a study or discussion of issues on which it has made

a policy stand. It has, instead, published its own narrow, unsupported, politically and racially agitative statements of judgment, regarding several highly complex and volatile national issues.

Joint Appendix ("J.A.") at 22–23.

**4.** The IRS also shifted from the conclusion reached in its determination letter that National Alliance was not "charitable" under Treas. Reg. § 1.501(c)(3)–1(d)(2) as a discriminatory organization, to the contention that it was not "charitable" in the common law sense because it condoned violence and other illegal activities. The district court dismissed this contention as falling outside its consideration of whether or not National Alliance was subject to an exemption as an educational organization, and the IRS does not continue to press the arguments before this court. *But see Bob Jones University v. United States,* —— U.S. ——, ——, 103 S.Ct. 2017, 2032, 76 L.Ed.2d 157 (1983).

**5.** The district court found authority to review this alternative ground for denial of tax-exempt status in the legislative history of 26 U.S.C. § 7428. The House Report on that section permits the court "to base its determination upon the reasons provided by the Internal Revenue Service in its notice to the party making the request for a determination, or based upon any new argument which the Service may wish to introduce at the time of the trial." H.Rep. No. 94–658, 94th Cong., 2d Sess. 285, *reprinted in* 1976 U.S.Code Cong. & Ad.News 2897, 3181–82.

exemption, and remanding the matter to IRS for further proceedings in conformity with the district court's memorandum and *Big Mama*.[6]

Both parties appealed. The government argues that the district court should have declared National Alliance not tax-exempt. National Alliance contends the district court should have declared it exempt.

The district court may well have reasoned that there could be no determination of the entitlement of National Alliance to an exemption in the absence of a valid administrative definition of the statutory term "educational." This view must assume, although the district court did not say so, that the National Alliance material could fit within some reasonable interpretation of the statutory term "educational." In large measure the parties, particularly the government, have argued the appeals as if the issue were whether reading the Methodology Test into the regulation would cure the vagueness found in *Big Mama*. These arguments are directed more at a review of the validity of a regulation rather than at the merits of a particular claim to tax exemption.

We think, however, that the appropriate first step is to examine the National Alliance materials to determine whether they could in any event qualify as "educational" within the exemption statute.

## I.

In response to an IRS request, National Alliance supplemented its application for exemption with back copies of its monthly newsletter, *Attack!*, and its membership bulletin, *Action*. It is these materials the IRS found noneducational.[7]

The nature of these publications may be summarized as follows. *Attack!* is the organization's principal publication; it contains stories, pictures, feature articles and editorials in a form resembling a newspaper. The general theme of the newsletter is that "non-whites"—principally blacks—are inferior to white Americans of European ancestry ("WAEA"), and are aggressively brutal and dangerous; Jews control the media and through that means—as well as through political and financial positions and other means—cause the policy of the United States to be harmful to the interests of WAEA. A subsidiary proposition is that communists have persuaded "neo-liberals" of equality among human beings, the desirability of racial integration, and the evil of discrimination on racial grounds.

6. The source of the district court's authority to review an IRS denial of tax-exempt status is found in 26 U.S.C. § 7428. In relevant part § 7428(a) provides:

In a case of actual controversy involving—
 (1) a determination by the Secretary—
 (A) with respect to the initial qualification or continuing qualification of an organization as an organization described in section 501(c)(3) which is exempt from tax under section 501(a) ... upon filing of an appropriate pleading, the United States Tax Court, the United States Court of Claims, or the district court of the United States for the District of Columbia may make a declaration with respect to such initial qualification or continuing qualification.... Any such declaration shall have the force and effect of a decision of the Tax Court or a final judgment or decree of the district court or the Court of Claims, as the case may be, and shall be reviewable as such.

Section 7428 was enacted as part of the Tax Reform Act of 1976 to provide rapid judicial review of § 501(c)(3) exemption controversies.

*See* Comment, *Tax Exemptions For Educational Institutions: Discretion and Discrimination*, 128 U.Pa.L.Rev. 849, 854–55 & n. 41 (1980). Although the section might be construed as providing a civil action for an independent, *de novo* determination of a right to exemption, it has been construed as providing a more customary type of judicial review of the administrator's decision upon the administrative record. *See Virginia Professional Standards v. Blumenthal*, 466 F.Supp. 1164, 1167–69 (D.D.C. 1979). A remand to the IRS for further consideration would be consistent with construing the section as authorizing a customary type of review proceeding, even though the language mentions only a "declaration" by the court.

7. Copies of *Attack!* (dating from April 1974 to July 1977) and copies of *Action* (dating from September 1975 to September 1977) were submitted to the IRS District Director and the district court, and are a part of the joint appendix submitted to this court. Neither party asserts that these materials are unrepresentative.

In support of these themes, each newsletter contains one or two news stories reporting incidents of murder or other violence by black persons, and identifying as Jews persons holding important media or other positions. Reports of black violence are presented as brief factual accounts—though usually without reference to source—accompanied by assertions of a media coverup and the inborn savagery of blacks.[8] Identifications as Jews of individuals holding significant positions are accompanied by assertions of resulting Jewish manipulation of American society.[9] Other articles and editorials attribute political and social events deemed detrimental to WAEA to the integration of non-whites into society or to Jewish manipulation of society.[10]

The organization's newsletter describes its themes of black savagery or Jewish manipulation as warnings to WAEA of the "dangers which arise from the presence of so many alien groups in our midst." Joint Appendix at 147. A National Alliance membership bulletin states that these perceived dangers can only be averted by the removal of non-whites and Jews from society.[11] Issues of *Attack!* advocate that the

8. Under the headline "Murder of Whites Began in 1969," for example, the May 1974 issue of *Attack!* began:

San Francisco Mayor Joseph L. Alioto's figure of 75 execution-style murders of White persons by Black killers in California since 1971 has been expanded to approximately 400 by adding figures for similar killings with an apparent racial motive in Illinois, Indiana, Michigan, Missouri, Ohio, and Wisconsin. Police officials who added the unsolved killings in the six Midwestern states to those in California went as far back as 1969. They did not, however, include similar killings elsewhere, such as those which recently occurred in Boston.

The Boston killings, as well as hundreds of others across the country, were apparently random and unplanned acts of savagery against Whites, rather than the cold-blooded, systematic executions which were counted in arriving at the figure of 400 for California and the Midwest. Whether all these 400 killings were, like the "Zebra" slayings in San Francisco, part of a single program of murder directed against Whites or whether they were the work of several different Black groups remains to be seen.

(J.A. 35) The article proceeded to discuss the failure of the Government or mass media to give this violence sufficient attention, concluding:

The mass media policy of suppressing news of Black crimes against Whites has allowed a Black gang (or gangs) to systematically murder approximately 400 White persons during the past five years without arousing public alarm and opposition.

If people all over the country had known about the first of these killings when they occurred, five years ago, there would have been enormous pressure on Federal and local authorities to apprehend the killers. If the killings had continued, and if they had been given full, nationwide news coverage, the White reaction soon would have forced drastic action against all militant Black organizations. In addition, there would have been generated a strong resistance to the continuation of the numerous racial integration programs which have made Whites such easy victims for Black killers.

It was for this very reason, of course, that the masters of the media suppressed the news. They did not want Americans to see the grisly consequences of turning a civilized country over to a horde of primitive savages, in the name of "equality."

*Id.*

9. An article published in each issue of *Attack!* over the three year period included in the joint appendix identifies "the few dozen men who control America's media" as Jews. The article concludes:

This Jewish control of the American mass media is the single most important fact of life, not just in America, but in the whole world today. And there is nothing: famine, inflation, fuel crisis, war—more dangerous to the future of our people.

Until this Jewish control of American public opinion is broken, continued misfortune, confusion, and decadence shall be our lot, and there can be no national liberation or regeneration.

(J.A. 41 *passim*)

10. For example, past issues of *Attack!* report that integration is responsible for a decline in average real income in the United States (J.A. 138, 150), a drop in SAT scores (J.A. 141), and higher taxes (J.A. 155); and Jewish manipulation of American society, *Attack!* asserts, led the United States into both World Wars. (J.A. 233, 307)

11. National Alliance's September 1977 *Action* bulletin states:

Despite different local problems and issues, there is a general agreement among all [similar] groups [throughout the world] on two things: (1) Non-White immigration must be

removal be violent.[12] The terms "non-whites," "blacks," and "Jews" are not defined.

In sum, National Alliance repetitively appeals for action, including violence, to put to disadvantage or to injure persons who are members of named racial, religious, or ethnic groups. It both asserts and implies that members of these groups have common characteristics which make them sufficiently dangerous to others to justify violent expulsion and separation.

Even under the most minimal requirement of a rational development of a point of view, National Alliance's materials fall short. The publications before us purport to state demonstrable facts—such as the occurrence of violent acts, perpetrated by black persons, the presence of Jews in important positions, and other events consistent with National Alliance themes. The real gap is in reasoning from the purported facts to the views advocated; there is no more than suggestion that the few "facts" presented in each issue of *Attack!* justify its sweeping pronouncements about the common traits of non-whites and Jews or the need for their violent removal from society. It is the fact that there is no reasoned development of the conclusions which removes it from any definition of "educational" conceivably intended by Congress. The material may express the emotions felt by a number of people, but it cannot reasonably be considered intellectual exposition.

Significantly, National Alliance has not suggested before the IRS or the district court or here *any* definition of "educational" which would arguably be met by its material.

The exposition of propositions the correctness of which is readily demonstrable is doubtless educational. As the truth of the view asserted becomes less and less demonstrable, however, "instruction" or "education" must, we think, require more than mere assertion and repetition.

We recognize the inherently general nature of the term "educational" and the wide range of meanings Congress may have intended to convey. In attempting a definition suitable for all comers, IRS, or any legislature, court, or other administrator is beset with difficulties which are obvious. We do not attempt a definition, but we are convinced that the National Alliance material is far outside the range Congress could have intended to subsidize in the public interest by granting tax exemption.

## II.

Aside from vagueness, it is clear that in formulating its regulation, IRS was attempting to include as educational some types of advocacy of views not generally accepted. But in order to be deemed "educational" and enjoy tax exemption some degree of intellectually appealing development of or foundation for the views advocated would be required. Hence, portion of the Regulation requires that the organization: "present a sufficiently full and fair exposition of the pertinent facts as to permit an individual or the public to form an independent opinion or conclusion. On the other hand, an organization is not educational if its principal function is the mere presentation of unsupported opinion." *See* note 2, *supra.* It is clear that the National Alliance material is not educational under that test.

One of the concerns in this area, because of First Amendment considerations, is that the government must shun being the arbi-

halted and all Non-Whites already present must be removed peaceably or otherwise; (2) the Jew must go, totally and unconditionally. (J.A. 400)

12. One issue of *Attack!* calls for "an armed confrontation between Whites and Blacks.... Far better the loss of a few million lives in a race war than the loss of everything through continued assimilation and miscegenation. After all no lives can be saved in the long run—

only genes, only race." (J.A. 69) Similarly, another issue states that "there will be a worldwide pogrom, which will, once and for all time, solve the problem of Jewish meglomania." (J.A. 59)

*Attack!* also approvingly reports individual acts of violence against non-whites. For example, under the headline "Fraternity Solves Race Problem," the January 1975 issue of *Attack!* reports the burial alive and death of a black applicant to a white fraternity. (J.A. 75)

ter of "truth." Material supporting a particular point of view may well be "educational" although a particular public officer may strongly disagree with the proposition advocated. Accordingly IRS has attempted to test the method by which the advocate proceeds from the premises he furnishes to the conclusion he advocates rather than the truth or accuracy or general acceptance of the conclusion.

Thus the Methodology Test presented in this proceeding contains the following four criteria:

1. Whether or not the presentation of viewpoints unsupported by a relevant factual basis constitutes a significant portion of the organization's communications.

2. To the extent viewpoints purport to be supported by a factual basis, are the facts distorted.

3. Whether or not the organization makes substantial use of particularly inflammatory and disparaging terms, expressing conclusions based more on strong emotional feelings than objective factual evaluations.

4. Whether or not the approach to a subject matter is aimed at developing an understanding on the part of the addressees, by reflecting consideration of the extent to which they have prior background or training.

Joint Appendix at 12.

Nothing in these criteria would suggest that the National Alliance material could be deemed educational.

### III.

 Nothing in this court's decision in *Big Mama Rag, Inc. v. United States*, 631 F.2d 1030 (D.C.Cir.1980), compels our reaching a different conclusion. The plaintiff in that case, Big Mama Rag, Inc. ("BMR, Inc."), was a non-profit organization formed for the purpose of creating "a channel of communication for women that would educate and inform them on general issues of concern to them." *Id.* at 1032. Its primary activity is the production of a monthly newspaper, *Big Mama Rag*, which prints articles, editorials, calendars of events, and other information of interest to women. It also devotes a considerable minority of its time to promoting women's rights through workshops, seminars, lectures, a weekly radio program, and a free library. *Id.* IRS denied BMR, Inc. tax-exempt status concluding among other things that the content of *Big Mama Rag* was not "educational" as that term is defined under the "full and fair exposition" standard. Treas. Reg. § 1.501(c)(3)–(1)(d)(3). The district court, reviewing the denial of an exemption under § 7428, granted IRS's motion for summary judgment on similar grounds.

On appeal BMR, Inc. argued that issues discussed in its publication received full and fair treatment; alternatively, the organization argued that the "full and fair exposition" standard was itself unconstitutional. After reviewing the definition of "educational" contained in § 1.501(c)(3)–(1)(d)(3), the *Big Mama* court held that the "full and fair exposition" test was unconstitutionally vague. The court found the test lacked "the requisite clarity, both in explaining which applicant organizations are subject to the standard and in articulating its substantive requirements." 631 F.2d at 1036. The court concluded this vagueness left the regulation inherently susceptible to discriminatory enforcement by individual IRS officials. *Id.* at 1040.

IRS had relied on the "full and fair exposition" test in deciding that BMR, Inc. was not tax-exempt. Having decided that the test was unconstitutional, this court vacated the judgment appealed from and remanded for further proceedings. The court did not direct the district court to enter judgment declaring BMR, Inc. tax-exempt, nor did it direct remand to IRS. The court may have assumed that the district court would take the latter course and that IRS would decide the matter under some other standard or analysis, perhaps reworking its regulation. In fact, however, the parties reached some sort of accommodation, and the district court dismissed the action with prejudice upon stipulation by the parties.

We assume that the court in *Big Mama* viewed the activity of BMR, Inc. as falling within the range of reasonable interpretation of "educational" as used in the statute, or at least not clearly outside such range. Thus the vague test posed a real risk that BMR, Inc. might have been denied exemption under the test while others not distinguishable on any principled objective basis might be granted exemption.

In the present case we see no possibility that the National Alliance publication can be found educational within any reasonable interpretation of the term.

Relying on the Supreme Court's decision in *Speiser v. Randall*, 357 U.S. 513, 518, 78 S.Ct. 1332, 1338, 2 L.Ed.2d 1460 (1958), the *Big Mama* court noted that while First Amendment activities need not be subsidized, the discriminatory denial of tax exemptions for engaging in particular speech can impermissibly infringe constitutionally protected rights. 631 F.2d at 1034. As a consequence the court held invalid a standard so vague that it might permit an IRS official to discriminate between applications on the basis of approval or rejection of the ideas expressed by the applying organizations. Neither *Speiser* nor *Big Mama,* however, stand for the proposition that an exemption may not be denied on criteria neutral with regard to viewpoint. *See Regan v. Taxation With Representation,* —— U.S. ——, 103 S.Ct. 1997, 76 L.Ed.2d 129 (1983); *Grayned v. City of Rockford,* 408 U.S. 104, 113, 92 S.Ct. 2294, 2301, 33 L.Ed.2d 222 (1972); *Cammarano v. United States,* 358 U.S. 498, 513, 79 S.Ct. 524, 533, 3 L.Ed.2d 462 (1959).

We have no doubt that publication of the National Alliance material is protected by the First Amendment from abridgement by law. *Healy v. James,* 408 U.S. 169, 92 S.Ct. 2338, 33 L.Ed.2d 266 (1972); *Police Dept. of Chicago v. Mosley,* 408 U.S. 92, 92 S.Ct. 2286, 33 L.Ed.2d 212 (1972); *Collin v. Smith,* 578 F.2d 1197 (7th Cir.1978). But it does not follow that the First Amendment re-

quires a construction of the term "educational" which embraces every continuing dissemination of views. *See Taxation With Representation,* —— U.S. at ——, 103 S.Ct. at 2001–2002 (quoting *Cammarano,* 358 U.S. at 515, 79 S.Ct. at 534 (Douglas, *J.,* concurring)) ("We again reject the 'notion that First Amendment rights are somehow not fully realized unless they are subsidized by the State.' "); *Big Mama,* 631 F.2d at 1040 ("And we by no means intend to suggest that tax-exempt status must be accorded to every organization claiming an educational mantle.").[13]

Based on a careful review of National Alliance's publications in the record before us, we are convinced that the IRS denial of exemption was not arbitrary or discriminatory, and was consistent with any reasonable interpretation of the statutory term "educational."

### IV.

We observe that, starting from the breadth of terms in the regulation, application by IRS of the Methodology Test would move in the direction of more specifically requiring, in advocacy material, an intellectually appealing development of the views advocated. The four criteria tend toward ensuring that the educational exemption be restricted to material which substantially helps a reader or listener in a learning process. The test reduces the vagueness found by the *Big Mama* decision.

The government does argue that the Methodology Test goes about as far as humanly possible in verbalizing a line separating education from non-educational expression. It says, in part:

> The methodology test leads to the minimum of official inquiry into [,] and hence potential censorship of, the content of expression, because it focuses on the method of presentation rather than the ideas presented.* The methodology test is thus the least intrusive standard available to evaluate an organization's qualifi-

---

**13.** In *Taxation With Representation* the Supreme Court expressly rejected the suggestion that a statute is subject to strict scrutiny when-

ever Congress subsidizes some speech, but not all speech. —— U.S. at ——, 103 S.Ct. at 2001–02.

cation for tax exemption. Although the test requires the exercise of judgment, abuses of such judgment are checked both by extensive administrative review and by prompt post-determination access to the courts. The statute commands the Internal Revenue Service, as it were, to steer between Scylla and Charybdis: exemption to all or exemption, in effect, only to degree-granting academic institutions. The methodology test, supervised by the courts, is a carefully-charted middle course.

---

\* We recognize that the First Amendment protects style as well as content from Government suppression (*Cohen v. California,* 403 U.S. 15, 26, 91 S.Ct. 1780, 1788, 29 L.Ed.2d 284 (1971)) but we are here dealing not with Government suppression but Government subvention. And Congress is free to select certain forms of expression for official support, without offending the Constitution. See *Harris v. McRae,* 448 U.S. 297, 314–318, 100 S.Ct. 2671, 2686–2689, 65 L.Ed.2d 784 (1980).

We need not, however, and do not reach the question whether the application of the Methodology Test, either as a matter of practice or under an amendment to the regulation would cure the vagueness found in the regulation by this court in *Big Mama.*

The judgment appealed from is reversed and the cause remanded with directions to enter judgment declaring National Alliance not tax-exempt.[14]

**14.** Denial of National Alliance's application for tax-exempt status might arguably flow from a source separate from the question of the organization's educational nature: National Alliance restricts membership on the basis of race. While the organization's articles of incorporation prohibit members, this prohibition practically extends only to members *as shareholders* in the corporation. National Alliance actively solicits individuals to become participating members in sponsored activities through its publications. (J.A. 40, 326–408). National Alliance expressly restricts such membership to "persons of European race." Application for Recognition of Exemption at 4. In *McGlotten v. Connally,* 338 F.Supp. 448 (D.D.C.1972), a three-judge court held that the Secretary of the Treasury could not grant tax-exempt status to a fraternal organization that denied membership to non-white. The granting of these tax benefits was viewed as federal "subsidies" of discriminatory practices in violation of the

equal protection component of the Due Process Clause of the Fifth Amendment as well as restrictions on "Federal financial assistance" under Title 42 U.S.C. § 2000d. Since that decision this circuit has held that "racially discriminatory [educational] institutions are ineligible for tax-exempt status under section 501(c)(3)." *Wright v. Regan,* 656 F.2d 820, 833 (D.C.Cir. 1981), *cert. granted,* —— U.S. ——, 103 S.Ct. 3109, 77 L.Ed.2d 1365 (1983). *See also Bob Jones University v. United States,* —— U.S. ——, 103 S.Ct. 2017, 76 L.Ed.2d 157 (1983); *Green v. Connally,* 330 F.Supp. 1150 (D.D.C. 1971), *aff'd sub nom. Coit v. Green,* 404 U.S. 997, 92 S.Ct. 564, 30 L.Ed.2d 550 (1971). These decisions certainly call into question whether an organization enjoying an educational tax exemption under federal law may deny membership on the basis of race. Having concluded that the instant organization is not entitled to an educational exemption, however, we do not address this issue.