**BULLFROG FILMS, INC., et al., Plaintiffs,**

v.

**Charles Z. WICK, Director, United States Information Agency, et al., Defendants.**

**No. CV 85–7930 AWT.**

United States District Court, C.D. California.

Oct. 24, 1986.

David Cole, Margaret Ratner, Michael Ratner, Morton Stavis, Center for Constitutional Rights, New York City, Ben Margolis, Margolis, McTernan, Scope & Epstein, Los Angeles, Cal., for plaintiffs.

Robert C. Bonner, U.S. Atty., Stephen D. Peterson, Asst. U.S. Atty., Los Angeles, Cal., Vincent M. Garvey, Richard C. Stearns, Dept. of Justice, Civil Div., Washington, D.C., for defendants.

Paul Hoffman, ACLU Foundation of Southern California, Los Angeles, Cal., Jack Novick, ACLU Foundation, New York City, for amici curiae American Civil Liberties Union, ACLU of Southern California, Film Arts Foundation, Intern. Documentary Ass'n, Writers Guild of America, West, Inc., The Nation Institute and Pen American Center.

TASHIMA, District Judge.

Plaintiffs in this action are independent film makers, film distributors and a membership association. They allege that the United States Information Agency (the "USIA" or "Agency"), violated their constitutional rights, which caused them economic injury, by refusing to certify their films as "educational" under the Agreement For Facilitating The International Circulation of Visual And Auditory Materials of An Educational, Scientific And Cultural Character,[1] an international treaty known as the Beirut Agreement. The Court concludes that the USIA regulations, on which the Agency based its certification decisions, are facially inconsistent with the First Amendment. Accordingly, the Court will enjoin the USIA from enforcing the challenged regulations and order the USIA to reconsider certification of plaintiffs' films under constitutionally acceptable criteria.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. THE BEIRUT AGREEMENT AND THE USIA REGULATIONS

The Beirut Agreement (sometimes the "Treaty"), is a treaty designed to promote the international exchange of audiovisual materials deemed to be "educational, scientific or cultural" in nature. Signatory nations agree to exempt certified materials from customs duties and licensing requirements. Under the terms of the Treaty, a person seeking duty-free treatment for his or her materials must apply for a certificate of educational, scientific or cultural character from the appropriate agency of the exporting country. Treaty, Art. IV, ¶ 2. The certificate is then submitted to the importing country, which makes its own independent determination as to whether the material meets the requirements for an exemption. Art. IV, ¶ 4. However, the importing country is required to "give due consideration" to the exporting country's determination. Art. IV, ¶ 6. Significantly, the Treaty contains a broad definition of "educational, scientific or cultural":

> Visual and auditory materials shall be deemed to be of an educational, scientific and cultural character:
>
> (a) When their primary purpose or effect is to instruct or inform through the development of a subject or an aspect of a

1. July 15, 1949, 17 U.S.T. 1579, T.I.A.S. No. 6116, 197 U.N.T.S. 3.

subject, or when their content is such as to maintain, increase or diffuse knowledge, and augment international understanding and goodwill; and

(b) When the materials are representative, authentic, and accurate; and

(c) When the technical quality is such that it does not interfere with the use made of the material.

Art. I.

The United States became a signatory of the Beirut Agreement in 1948; however, Senate ratification did not follow until 1966. Implementing legislation, Pub.L. No. 89–634, 80 Stats. 879 (1966) ("P.L. 89–634"), was enacted in the same year. The implementing statute does not establish a specific mechanism or framework for effectuating the Treaty; rather, Congress chose to permit the Executive Branch to fill in the details. The statute authorizes the President to designate the agency to carry out the Treaty's provisions, and vests the designated agency with broad discretion in carrying out its mandate:

It shall be the duty of the Federal agency or agencies so designated to take appropriate measures for the carrying out of the provisions of the Agreement including the issuance of regulations.

*Id.* § 1. Congress also provided that the Agency could seek guidance from other executive agencies in carrying out the Treaty:

Agencies of the Federal Government are authorized to furnish facilities and personnel for the purpose of assisting the agency or agencies designated by the President in carrying out the provisions of the Agreement.

*Id.* § 2.

The USIA is the agency designated by the President to implement the Treaty. Its implementing regulations set out a three-step procedure for certificate applications. Applications first are reviewed by an Attestation Officer. 22 C.F.R. § 502.3(g).[2] Upon an adverse ruling, the applicant may appeal to a Review Board. § 502.5(b). Final Agency review is by the Director of the USIA. § 502.5(c).

The regulations also establish substantive criteria for determining eligibility for certification. These substantive regulations are both definitional and interpretive in nature. Plaintiffs challenge three of these regulations.

First, plaintiffs challenge § 502.6(a)(3), which defines the kinds of materials the Agency will deem to be of "international educational character." This regulation incorporates word-for-word the broad definition of "educational" contained in Article I of the Treaty, quoted above.

Plaintiffs next challenge two of the USIA's "interpretive" regulations, the purpose of which is to guide the Agency in its certification process. The Agency itself describes these regulations as "relat[ing] to some of the problem areas most frequently encountered." § 502.6(b).[3] The first regulation, § 502.6(b)(3), states in pertinent part:

The Agency does not certify or authenticate materials which by special pleading attempt generally to influence opinion, conviction or policy (religious, economic or political propaganda), to espouse a cause, or conversely, when they seem to attack a particular persuasion....[4]

The second challenged regulation, § 502.6(b)(5), provides:

The Agency does not regard as augmenting international understanding or good

---

**2.** The USIA's implementing regulations are found at 22 C.F.R. §§ 502.1–502.8. All subsequent references to these regulations will be to the section number only.

**3.** For example, § 502.6(b)(1) (which is not challenged in this action) states that the USIA will not certify materials "the primary purpose of which is to amuse or entertain."

**4.** § 502.6(b)(3) goes on to state:

Visual and auditory materials intended for use only in denominational programs or other restricted organizational use in moral and religious education and which otherwise meet the criteria set forth under paragraph (a) of this section and paragraph (b)(5) of this section, may be determined eligible for certification in the judgment of the Agency.

will and cannot certify or authenticate any material which may lend itself to misinterpretation, or misrepresentation of the United States or other countries, their peoples or institutions, or which appear to have as their purpose or effect to attack or discredit economic, religious, or political views or practices.

## B. PLAINTIFFS' CLAIMS

Plaintiffs' basic contention is that the USIA regulations permit the Agency to hinder the foreign distribution of films that present viewpoints which are critical of, or not in conformity with, those of the current Administration. Each plaintiff has an interest in one or more of the following films, characterized by them as follows:

*In Our Own Backyards: Uranium Mining in the United States* ("*Our Own Backyards*"), which examines the impact of uranium mining on the environment and on workers and nearby residents. It purports to explore the question of "who is responsible" for setting and enforcing safety standards. (Comp. ¶ 31.)

*Peace: A Conscious Choice* ("*Peace*"), which maintains that neither Americans nor the Soviets want nuclear war and that "an attitude of cooperation" would be beneficial. (Comp. ¶ 37.)

*Whatever Happened to Childhood?* ("*Childhood*"), which examines the changed circumstances and pressures facing American children today, including drug usage and changing notions about sexual behavior. (Comp. ¶ 41.)

*Save the Planet,* which covers the debate over nuclear power. (Comp. ¶ 46.)

*Ecocide: A Strategy of War* ("*Ecocide*"), which documents "the environmental effects of U.S. tactics during Vietnam." (Comp. ¶ 57.)

*The Secret Agent,* which examines the United States' use of Agent Orange during the Vietnam War. (Comp. ¶ 51.)

*From the Ashes ... Nicaragua Today* ("*From the Ashes*"), which is about "the historical roots of the Nicaraguan national liberation movement" and purports to trace "the history of U.S.-Nicaraguan relations." (Comp. ¶ 66.)

Many of these films have won various prizes and awards. For example, *Ecocide, From the Ashes* and *Childhood* each won a Red Ribbon at the American Film Festival, which is judged by United States librarians. Nonetheless, each was denied a Treaty certificate under the criteria set out in the USIA regulations.[5] Typically, the USIA found the films to "espouse a cause", to be "inaccurate" or "imbalanced", or to be capable of "being misinterpreted or misunderstood by foreign audiences lacking adequate American points of references." For example, the USIA determined that *Our Own Backyards,* among other things, attempts to "espouse a cause and influence opinion," contrary to § 502.6(b)(3), because it presents "an anti-nuclear message" and has a purpose of "persuad[ing] the audience that all uranium mining should be prevented." [6] The USIA also found the film to be "inaccurate" under § 502.6(a)(3) because it emphasizes the high rate of cancer among uranium miners without mentioning that the miners' cancers may have been caused by cigarette smoking. Similarly, the USIA decided that *Childhood* is not "representative" under § 502.6(a)(3) because "the Agency does not find that the youth in the film are typical or representative of all American youth today." *Ecocide* failed to comply with §§ 502.6(a)(3) and (b)(5) partly because "[t]he film does not augment international understanding as it attacks the United States." *From the Ashes* was rejected because it leads viewers to conclude "that the United States is the primary cause of instability, poverty,

---

**5.** *The Secret Agent* originally was denied certification, but received a certificate upon appeal to the Review Board. This is discussed further in footnote 11.

**6.** All quoted passages regarding the films' content are taken from the Agency's final written Decisions on plaintiffs' films which, according to the Agency, constitute its official position on each film.

and oppression in Nicaragua," thereby constituting both an "attempt to persuade", contrary to § 502.6(b)(3), and "an attack on the institutions of the United States", contrary to § 502.6(b)(5). The film also was found to be imbalanced because it does not discuss "any of the reasons for the policy adopted by the Government of the United States toward the present or former government of Nicaragua." *From the Ashes* also was found to contain at least one factual inaccuracy.

Although the USIA declined to certify plaintiffs' films as "educational", it did issue certificates to films with titles such as *To Catch a Cloud: A Thoughtful Look at Acid Rain,* by the Edison Electrical Institute, *Radiation ... Naturally,* by the Atomic Industrial Forum, and *The Family: God's Pattern for Living,* by the Moody Institute of Science.[7] Plaintiffs allege that by granting certificates to films such as these, while denying certificates to plaintiffs' films, the USIA is engaging in selective censorship by rewarding film makers whose views are ideologically "correct" and thus has turned the Treaty into a vehicle for social and political propaganda.

Plaintiffs' complaint states three claims. The first claim alleges that §§ 502.6(b)(3) and (b)(5) are unconstitutional on their face as violative of the First and Fifth Amendments; also that these provisions are invalid on their face as inconsistent with the Treaty.[8] The second claim alleges that these two provisions and § 502.6(a)(3) are invalid as applied, on the ground that the Agency's application is contrary to the Constitution, the Treaty and the Administrative Procedure Act, 5 U.S.C. §§ 558 and 706 ("APA"). The third claim alleges that the USIA illegally delegates to "non-neutral" agencies the authority to grant or deny certificates. Plaintiffs seek declaratory and injunctive relief.

Before the Court are two motions. The first is defendants' motion to dismiss or, in the alternative, for summary judgment. The motion to dismiss argues that plaintiffs lack standing to sue because they cannot show any "injury in fact" and because the injury they complain of cannot be redressed by this Court. Alternatively, defendants seek summary judgment on the grounds that: (1) the challenged regulations are facially valid; (2) the USIA does not illegally delegate its authority to other agencies because Congress specifically authorized the USIA to consult other federal agencies; and (3) with respect to the "as applied" claim, this Court may not review the Agency's certification decisions because they are nonjusticiable under the "political question" doctrine, and because under the APA such decisions are "committed to agency discretion by law."

Plaintiffs have filed a cross-motion for summary judgment, which they bring only with respect to their first claim, *i.e.,* that the regulations are facially invalid.[9]

## II. DISCUSSION

### A. STANDING

Article III standing requires a plaintiff to show at least that (1) "he personally has suffered some actual or threatened injury" as a result of defendants' actions; (2) that the injury "fairly can be traced to the challenged action"; and (3) is "likely to be redressed by a favorable decision." *Valley Forge Christian College v. Americans United for Separation of Church And State, Inc.,* 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982) (citations and footnote omitted).

Here, plaintiffs allege that the USIA's refusal to certify their films has harmed them economically because "the international distribution of plaintiffs' films has been delayed, limited, hindered, and often

---

**7.** *The Family* was certified under that portion of § 502.6(b)(3), quoted in footnote 4, as intended for use by moral or religious organizations.

**8.** The first claim does not attack the facial validity of § 502.6(a)(3).

**9.** Plaintiffs are not seeking summary judgment on their other claims because they believe those claims require discovery. Accordingly, plaintiffs have filed an F.R.Civ.P. 56(f) affidavit.

effectively foreclosed." (Comp. ¶ 74.) They further allege that "these restrictions result in a loss of revenue to plaintiffs, which impedes their ability to continue making similar films." *Id.*

In addition to the economic injury, plaintiffs allege that they have been and still are chilled in "the exercise of First Amendment rights in the making of new films." They allege that their inability to obtain certificates "selectively limit[s] the impact of the views expressed in plaintiffs' films on the basis of the films' content." *Id.* They further allege that they will continue making documentaries, but must produce future films with the awareness that "if they present a point of view that is considered unfavorable to the United States by USIA and other agency officials", they will be denied a certificate. (Comp. ¶ 75.)

### 1. *Injury in Fact*

Defendants contend that plaintiffs' allegations of injury are too inspecific and conclusory to support standing.[10] Relying on *Western Mining Council v. Watt*, 643 F.2d 618 (9th Cir.), *cert. denied*, 454 U.S. 1031, 102 S.Ct. 567, 70 L.Ed.2d 474 (1981), defendants maintain that when the standing issue is raised on a motion to dismiss, "the facts demonstrating standing must be clearly alleged in the complaint." *Id.* at 624. Defendants contend that this requirement is not met here because there are no allegations that plaintiffs ever tried to export their films or even that they intend to export their films. Specifically, defendants note that there are no factual allegations describing (1) when, where or how distribution of plaintiffs' films was hindered; (2)

specific instances when plaintiffs had to pay foreign customs duties in order to distribute their films; and (3) the manner in which plaintiffs suffered loss of revenue.

The Court concludes that *Western Mining* does not require the kind of detailed factual pleading urged by defendants. The wholly conclusory complaint there stated *no* facts to support standing. For example, plaintiff there claimed that a statute authorizing the Secretary of the Interior (the "Secretary") to contract with local officials for law enforcement on public lands violated plaintiffs' rights to be protected against unreasonable search and seizure. The complaint did not allege that the statute had been applied to plaintiffs or was threatened to be applied to plaintiffs or anyone else; therefore, plaintiffs had no standing to challenge the statute. *Id.* The plaintiffs also complained about a statute that directed the Secretary to prepare a plan for the development and use of certain lands, alleging that they would be harmed by such a plan. However, the complaint failed to allege that the Secretary was implementing or threatened to implement such a plan. Moreover, not every possible plan would interfere with plaintiffs' mining rights. Accordingly, the Court held that plaintiffs had failed to establish their standing to sue. *Id.* at 627.

█ Here, unlike *Western Mining*, the critical facts necessary to support standing clearly are alleged in the complaint, *i.e.*, plaintiffs applied for certificates and their respective applications were denied by the USIA, in reliance on the challenged regulations.[11] While not specifically alleged, com-

---

**10.** Defendants also challenge the standing of certain plaintiffs on the ground that those plaintiffs do not hold the "basic" rights to the films. *See* § 502.3. According to the Agency, "basic" rights are worldwide rights from which the assignment of subsidiary or collateral rights, such as distribution or reproduction, derive. This argument requires little discussion, because it is undisputed that at least one plaintiff is the basic rights' holder for each film; thus, the lawsuit may continue. *See Watt v. Energy Action Educ. Found.*, 454 U.S. 151, 160, 102 S.Ct. 205, 212, 70 L.Ed.2d 309 (1982); *Village of Arlington Heights v. Metropolitan Hous. Corp.*, 429 U.S. 252, 264 n.

9, 97 S.Ct. 555, 862 n. 9, 50 L.Ed.2d 450 (1977) (presence of one plaintiff with standing makes it unnecessary to consider whether other plaintiffs have standing to maintain suit).

**11.** As mentioned previously, *The Secret Agent* did receive a certificate after appeal to the Review Board. Thus, insofar as any of the plaintiffs posit their standing on their association with that film, they cannot show any economic injury in fact. However, even if certain plaintiffs lack standing to the extent they claim an injury from their connection with *The Secret Agent*, their interest in other films gives them

mon sense reveals that as a result of the denials of certification, plaintiffs' films are now at a competitive disadvantage in foreign markets relative to films that did receive certificates. Injuries to competitive interests are sufficient to establish standing. *Association of Data Processing Serv. Orgs., Inc. v. Camp,* 397 U.S. 150, 152, 90 S.Ct. 827, 829, 25 L.Ed.2d 184 (1970); *Glacier Park Found. v. Watt,* 663 F.2d 882, 885 (9th Cir.1981) ("The Foundation was injured when ... [it] was unable to compete on an equal basis for the concessions contract"). Moreover, plaintiffs have submitted declarations which describe the obstacles they faced in attempting to distribute their films and affirmatively assert their intentions to make more films in the future. Such additional particularized declarations in support of plaintiffs' standing properly may be considered on the issue. *Warth v. Seldin,* 422 U.S. 490, 501, 95 S.Ct. 2197, 2206, 45 L.Ed.2d 343 (1975). In particular, Melanie Maholick, who is Secretary-Treasurer of the International Women's Film Project (which holds the copyright on *From the Ashes*), explicitly states that "on several occasions we have had to pay duties for importing [sic] *From the Ashes* ... into Canada, duties we would not have paid if the film had been certified." Although defendants attack these declarations as self-serving and conclusory, the Court finds them sufficient to establish standing.

### 2. *Redressible Injury*

Defendants argue that even if plaintiffs have alleged an injury in fact, the injury complained of is not "likely to be redressed by a favorable decision." *Simon v. Eastern Ky. Welfare Rights Org.,* 426 U.S. 26, 38, 96 S.Ct. 1917, 1924, 48 L.Ed.2d 450 (1976). They contend that even if the Court were to order the USIA to grant the certificates, there is no certainty that plaintiffs will receive the desired customs duties exemptions because the ultimate decision to grant or deny exemptions is made by the

importing country. Thus, defendants argue, because relief depends on "the independent actions of some third party not before the court", *id.* at 41–42, 96 S.Ct. at 1925–26, and because such action is "sufficiently uncertain to break the chain of causation between the plaintiffs' injury and the challenged Government action", *Allen v. Wright,* 468 U.S. 737, 759, 104 S.Ct. 3315, 3329, 82 L.Ed.2d 556 (1984), the complaint must be dismissed. The Court does not agree.

First, in both *Simon* and *Allen* the attenuation between the alleged injury and defendants' action was far more pronounced than in the case at bench. For example, in *Simon,* plaintiffs were indigents who challenged an Internal Revenue Service ("IRS") ruling granting tax exemptions to hospitals that denied services to people who could not pay for them. The Court found plaintiffs lacked standing because the complaint alleged only that the IRS ruling had "encouraged" the hospitals to deny services, and it was purely speculative whether ordering the IRS to return to its previous policy would result in the hospitals' providing services. It was entirely possible that the hospitals would elect to forego favorable tax treatment rather than incur the expenses of free treatment for indigents. This was especially true in light of the showing that only four percent of hospital revenue came from private contributions that might be affected by a change in the hospitals' status as "charitable" institutions. 426 U.S. at 43, 96 S.Ct. at 1926.

In *Allen,* the parents of black public school children alleged that the IRS deprived their children of the right to an education in desegregated public schools by failing to deny tax-exempt status to racially discriminatory private schools. The Court denied standing on the ground that, among other things, it was "entirely speculative" whether IRS denial of a tax exemption would cause any particular private school to change its policies or cause any

---

and the other plaintiffs have standing to challenge the regulations with respect to the remaining films and are capable of obtaining the de-

claratory relief with which *The Secret Agent* plaintiffs primarily are concerned. *See* footnote 10.

given parent of a private school child to transfer the child to a public school. 468 U.S. at 758, 104 S.Ct. at 3328.

■ Unlike those cases, there is no reason here to believe that the actions of independent third parties, *i.e.*, the importing countries, will render ineffectual this Court's orders. Defendants have cited no instance where an importing country (other than the United States) has overridden the certification decision of the exporting country. The only matter which appears with any certainty is that by denying educational status to plaintiffs' films, defendants have erected an absolute barrier between plaintiffs and the desired customs exemptions. Thus, this case is closer to *Village of Arlington Heights v. Metropolitan Hous. Dev. Corp.*, 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977), than to *Simon* or *Allen*.

In *Arlington Heights*, a developer who wanted to build a low-income housing project challenged a city's zoning regulations. The Court first found that the challenged government action presented an "absolute barrier" to plaintiff's construction of the project. *Id.* at 261, 97 S.Ct. at 561. The Court then found that plaintiff had standing even though "[a]n injunction would not, of course, guarantee that [the housing project] would be built", *id.*, since plaintiff still would have to qualify for federal subsidies, secure financing, etc. The Court recognized that "all housing developments are subject to some extent to similar uncertainties" but concluded that a project

as detailed and specific as plaintiff's did not require the court to engage in "undue speculation as a predicate for finding that the plaintiff has the requisite personal stake in the controversy." *Id.* at 261–262, 97 S.Ct. at 561. The case at bench is no different. Plaintiffs not only are faced with an "absolute barrier", but the uncertainties they face with respect to the importing countries' actions are no different than those faced by any other applicant for a certificate.[12]

## B. ARE THE REGULATIONS FACIALLY INCONSISTENT WITH THE TREATY

If it is possible to decide this case on non-constitutional grounds, the Court must do so. Thus, the Court must first address plaintiffs' contention that the challenged regulations are invalid because they are inconsistent with the Treaty.

■ Plaintiffs maintain that the clear purpose of the Treaty is to *facilitate* the free flow of educational materials among nations and for that reason the Treaty contains a broad definition of what is "educational." They contend further that the Agency's regulations conflict with the Treaty because the regulations are restrictive and impose conditions, *e.g.*, the rejection of films that "espouse a cause", that are neither envisioned by the Treaty's language nor in harmony with its spirit. The problem with this argument is that the Treaty's language is so broad that it provides no standards against which the Court

---

**12.** Defendants also challenge plaintiffs' First Amendment standing on the ground that plaintiffs' claim of a "subjective chill" of their First Amendment rights fails under *Laird v. Tatum*, 408 U.S. 1, 92 S.Ct. 2318, 33 L.Ed.2d 154 (1972). The Court does not believe it necessary to address the sufficiency of plaintiffs' future "chill" allegations because plaintiffs clearly have alleged a *past* infringement of their First Amendment rights, *i.e.*, that they were denied a benefit on the basis of their speech. However, the government vigorously disputes whether the denial of a certificate even implicates the First Amendment at all, arguing that the government is under no obligation affirmatively to assist plaintiffs in the exercise of their constitutional rights. *See* Sect. II.C.1, *infra.*

In this case, the merits and the standing question are closely intertwined. The Court believes that the government's contention that this is not a First Amendment case goes to the merits of plaintiffs' claim and will not be considered at this point in the analysis. *See Warth v. Seldin*, 422 U.S. at 500, 95 S.Ct. at 2205 ("standing in no way depends on the merits of the plaintiff's contention that particular conduct is illegal"). However, even if this issue goes to the standing question, in view of my conclusion that plaintiffs' First Amendment rights are indeed at stake, *see* Sect. II.C.1, *infra*, I would still find that standing properly has been alleged.

can judge the Agency's regulations. Moreover, the implementing legislation also is written in extremely broad terms and undoubtedly was intended to give the USIA broad discretion in interpreting the Treaty by simply directing the Agency to "take appropriate measures for the carrying out of the provisions of the Agreement including the issuance of regulations." P.L. 89–634, § 1. Finally, the Agency's regulations seem to be consistent with the guidelines set out by the United Nations Educational, Scientific and Cultural Organization ("UNESCO") (the Beirut Agreement's sponsoring organization), thus, undercutting much of plaintiffs' argument. Thus, there is no basis on which to hold that the regulations are inconsistent with the Treaty.

Nonetheless, the USIA regulations are not completely insulated from judicial review. Although the Agency's discretion in promulgating implementing regulations certainly is broad, it just as certainly is not "unfettered", as urged by defendants' counsel at oral argument. Ultimately, the Agency can exercise its discretion in promulgating regulations only within Constitutional limits. It is well established that treaty obligations cannot justify otherwise unconstitutional governmental conduct. *Reid v. Covert*, 354 U.S. 1, 16–19, 77 S.Ct. 1222, 1230–1231, 1 L.Ed.2d 1148 (1957); *In re Aircrash in Bali, Indonesia*, 684 F.2d 1301, 1308–09 (9th Cir.1982). Thus, the Court must proceed to examine the constitutional challenge to the regulations.

## C. CONSTITUTIONAL REVIEW OF THE REGULATIONS

### 1. *Are Plaintiffs' First Amendment Rights At Stake?*

Defendants argue that the challenged regulations cannot be said to violate plaintiffs' constitutional rights because the regulations "impose no sanctions or penalty" on those who desire to make and distribute films. Even if an applicant is denied an educational certificate, he or she remains free to distribute his or her films anywhere in the world; he or she simply will have to pay whatever customs duties the importing country may require, just as would any other film maker. In defendants' view, the action is nothing more than an impermissible demand that the government "affirmatively assist" plaintiffs in the exercise of their constitutional rights by helping to make their films more marketable abroad.

It certainly is true, as defendants assert, that First Amendment rights are not infringed merely because the government refuses to subsidize those rights. *E.g., Regan v. Taxation With Representation*, 461 U.S. 540, 103 S.Ct. 1997, 76 L.Ed.2d 129 (1983); *Cammarano v. United States*, 358 U.S. 498, 79 S.Ct. 524, 3 L.Ed.2d 462 (1959). Those cases recognize Congress' right, under the spending power, reasonably to refuse to use funds from the United States Treasury to subsidize certain constitutionally protected activities. However, those cases are inapposite here simply because plaintiffs are not asking Congress to subsidize them. Any "subsidy" under the Treaty would come from the treasuries of the foreign states that agree to waive their customs duties.

Defendants' reliance on *Maher v. Roe*, 432 U.S. 464, 97 S.Ct. 2376, 53 L.Ed.2d 484 (1977), is equally misplaced. There, the Court held that a state has no constitutional obligation to fund or promote abortion and in fact can refuse to fund abortion while funding childbirth because its refusal "places no obstacles ... in the pregnant woman's path to an abortion." *Id.* at 474, 97 S.Ct. at 2382. Thus, "the State may have made childbirth a more attractive alternative, thereby influencing the woman's decision, but it has imposed no restriction on access to abortion that was not already there." *Id.* Defendants seize on this language to argue that any obstacles to the exercise of plaintiffs' First Amendment rights come from the customs duties of other countries and since the United States Government did not create those obstacles, it has no obligation to remove them.

This argument ignores the role of an educational certificate in the Treaty's scheme. A certificate from the exporting country is an indispensible prerequisite to

obtaining the benefits of the Treaty. Thus, defendants themselves characterize educational certificates as "analogous to government benefits" because they are "valuable possessions" that are the *sine qua non* for receipt of customs exemptions." Defts.' Reply Br. at 5. By entering into the Treaty, the United States has elected to make these benefits available to its citizens.[13] It is clear that once the government makes benefits available, it may not withhold them on the basis of "unconstitutional conditions":

> For at least a quarter-century, this Court has made clear that even though a person has no "right" to a valuable governmental benefit and even though the government may deny him the benefit for any number of reasons, there are some reasons upon which the government may not rely. It may not deny a benefit to a person on a basis that infringes his constitutionally protected interests—especially, his interest in freedom of speech. For if the government could deny a benefit to a person because of his constitutionally protected speech or association, his exercise of those freedoms would in effect be penalized and inhibited.

*Perry v. Sindermann,* 408 U.S. 593, 597, 92 S.Ct. 2694, 2697, 33 L.Ed.2d 570 (1972). *See also Speiser v. Randall,* 357 U.S. 513, 78 S.Ct. 1332, 2 L.Ed.2d 1460 (1958).

Thus, we proceed to consider plaintiffs contention that certification was denied due to plaintiffs exercise of their First Amendment rights.

### 2. *Standard of Review*

Before examining the validity of the regulations, the Court first must determine the proper standard of review. That determination, in turn, depends on whether the First Amendment applies with equal force to communications directed toward foreign audiences as it does to domestic communications or whether a less exacting level of scrutiny is to be applied when foreign audiences are involved.[14]

■ At oral argument, the Court *sua sponte* raised the issue of whether and the extent to which the First Amendment applies abroad. *Amici,* as well as the parties, have provided supplemental briefing on the issue. After review of the relevant authorities, the Court concludes there can be no question that, in the absence of some overriding governmental interest such as national security, the First Amendment protects communications with foreign audiences to the same extent as communications within our borders. Thus, the regulations at issue here must undergo the same constitutional analysis as would be applied to any legislation claimed to infringe on First Amendment freedoms at home.

No Supreme Court case squarely holds that the First Amendment applies abroad. However, in *Haig v. Agee,* 453 U.S. 280, 308, 101 S.Ct. 2766, 2782, 69 L.Ed.2d 640 (1981), the Court suggested as much, al-

---

**13.** Defendants make a passing contention, in a footnote, that the Treaty and its implementing statute do not give rise to a private right of action. They rely on *Mannington Mills v. Congoleum Corp.,* 595 F.2d 1287, 1298 (3d Cir.1979). This case clearly is distinguishable. First, as mentioned earlier, plaintiffs challenge the Agency's actions under the APA, which permits them independently to proceed, regardless of whether or not a private right of action exists under the Treaty. *Glacier Park Found. v. Watt,* 663 F.2d 882, 885 (9th Cir.1981). Further, in the posture of this case, unlike *Mannington Mills,* plaintiffs are not attempting, *per se,* to enforce the Treaty. They seek to enforce their rights under the *Constitution,* claiming that the Treaty regulations are unconstitutional. Defendants have cited no case which bars a citizen, under these circum-

stances, from vindicating his or her constitutional rights.

**14.** Of course, to the extent plaintiffs claim to be chilled in the future exercise of their First Amendment rights, the "foreign audience" aspect becomes less important. This is because any future films plaintiffs may make almost certainly will be intended for domestic, as well as foreign, distribution. Thus, if the USIA regulations cause plaintiffs to steer clear of certain topics or to treat those topics more "carefully", then the speech available for domestic audiences to hear also will be affected; thus, traditional First Amendment principles would come into play.

though it did not explicitly so decide.[15] Nonetheless, it is established beyond dispute that the Bill of Rights protects American citizens abroad. *Reid v. Covert*, 354 U.S. at 5–6, 77 S.Ct. at 1224–1225. There, the court stated in the strongest of terms:

> The United States is entirely a creature of the Constitution. Its power and authority have no other source. It can only act in accordance with all the limitations imposed by the Constitution. When the Government reaches out to punish a citizen who is abroad, the shield which the Bill of Rights and other parts of the Constitution provide to protect his life and liberty should not be stripped away just because he happens to be in another land.

*Id.*

The government has conceded, as it must, that the Bill of Rights applies abroad, but argues that "the exercise of free speech within foreign nations by Americans is subordinate to significant foreign policy considerations and, as such, subject to reasonable regulation." Defts.' Supp.Memo. at 4. Essentially, the government contends that when United States citizens direct their speech to foreign audiences, the government may regulate such speech on the basis of content; further, that the traditional standards for determining if a law is unconstitutionally vague should be relaxed when foreign audiences are involved, since the government must be permitted to fashion foreign affairs-related regulations in a broad manner. The Court must reject these overly broad propositions, which are fraught with the most serious constitutional implications and which would open the door to unprecedented and intolerable governmental interference with freedom of expression.[16]

The government's position clearly is not supported by the cases on which it relies. For example, *Haig v. Agee* did *not* subordinate otherwise protected free speech interests to the government's foreign policy concerns. There, the State Department revoked the passport of a former CIA agent who, while residing abroad, engaged in an extensive campaign against the CIA by exposing the identity of CIA covert agents. His efforts seriously disrupted American intelligence operations, led to the disclosure of classified information and the killings of several persons he had identified as CIA agents. 453 U.S. at 288–89 & n. 7, 101 S.Ct. at 2772–73 & n. 7. Responding to Agee's contention that the revocation unconstitutionally limited his right to criticize the government, the Court noted that although the revocation turned in part on the content of Agee's speech, his statements "clearly were not protected by the Constitution" because the statements concededly jeopardized national security, in the same manner as the disclosure of the sailing dates of troop transports. *Id.* at 308–09, 101 S.Ct. at 2782–83 (*citing Near v. Minnesota*, 283 U.S. 697, 716, 51 S.Ct. 625, 631, 75 L.Ed. 1357 (1931)). Thus, *Haig v. Agee* simply applied the long-recognized principle that certain forms of speech, precisely because of their content, are not entitled to First Amendment protection. *See also, Roth v. United States*, 354 U.S. 476, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957) (obscenity); *Chaplinsky v. New Hampshire*, 315 U.S. 568, 62 S.Ct. 766, 86 L.Ed. 1031 (1942) ("fighting words").

The Court also held that the passport revocation did not impermissibly infringe Agee's freedom to travel abroad because that interest was outweighed by national security and foreign policy concerns and

---

**15.** A number of lower court decisions have assumed, without explicitly deciding, that the First Amendment protects Americans abroad. *E.g., Carlson v. Schlesinger*, 511 F.2d 1327, 1331 (D.C. Cir.1975).

**16.** The government also argues that the world at large is not a "First Amendment forum"; therefore, that the term "educational" may be given a different and more restrictive meaning (for First Amendment purposes), in the international context than it carries in the domestic arena. This argument ignores the fact, as evidenced by recent events, that matters occurring abroad, *e.g.,* government "news leaks" to the foreign press, are likely to find their way into this country and become a part of our domestic political debate.

must yield to reasonable regulation. *Haig,* 453 U.S. at 306–08, 101 S.Ct. at 2781–82. In so holding, the Court distinguished between the *right* to travel interstate, which is virtually unqualified, and the *freedom* to travel internationally, which may be regulated within the bounds of due process. *Id.* Defendants argue that this distinction between activity occurring within and without our borders should carry over to the exercise of free speech. However, it cannot seriously be argued that freedom of expression, perhaps the most precious, and at the same time the most vulnerable, of our fundamental rights, may be regulated in the same manner and to the same extent as the freedom to travel abroad. In fact, the Supreme Court cases that upheld restrictions on travel did so only after carefully noting that no content-based regulation of First Amendment interests was involved. *See Regan v. Wald,* 468 U.S. 222, 241, 104 S.Ct. 3026, 3038, 82 L.Ed.2d 171 (1984); *Zemel v. Rusk,* 381 U.S. 1, 13, 85 S.Ct. 1271, 1279, 14 L.Ed.2d 179 (1965); *cf. Aptheker v. United States,* 378 U.S. 500, 84 S.Ct. 1659, 12 L.Ed.2d 992 (1964) (travel restrictions not permitted when First Amendment considerations of political belief or affiliation implicated); *Kent v. Dulles,* 357 U.S. 116, 78 S.Ct. 1113, 2 L.Ed.2d 1204 (1958) (same).

■ Thus, when *Haig v. Agee* is read in conjunction with the other "travel" cases, it is clear that there is no "sliding scale" of First Amendment protection under which the degree of scrutiny fluctuates in accordance with the degree to which the regulation touches on foreign affairs. Rather, the only permissible non-neutral inquiry into the content of the speech is whether the statements adversely affect foreign policy interests to such a degree that the speech is completely unprotected. As *Haig v. Agee* itself indicates, the clearest example of the kind of compelling government interest that would lead to such a result is where the speech poses a clear and direct threat to national security.

■ In the case at bench, no contention is made that any such national security

interests are at stake. Moreover, the government's asserted foreign policy interests are not sufficiently strong to justify content regulation or the promulgation of impermissibly vague regulations. First, as stated, the mere existence of a treaty is not enough to support otherwise unconstitutional government conduct. Second, the government's concern that by respecting constitutional principles it may have to certify some films that it believes are not "educational" is not sufficient to justify infringement on plaintiffs' freedom of expression, particularly political expression. The government argues that our relations with foreign states will suffer because other nations may come to believe that the United States is attempting to get around their customs duties by certifying ineligible films. However, the Treaty expressly provides that the importing country can reject films it does not believe to be educational. Thus, foreign states that may have a different conception of what is "educational" may elect to refrain from granting exemptions to such materials.

3. *Facial Validity of §§ 502.6(b)(3) and (b)(5)*

(a) Vagueness Challenge

■ The Supreme Court has identified three reasons why ill-defined enactments are void for vagueness under the due process clause of the Fifth Amendment:

Vague laws offend several important values. First, because we assume that man is free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly. Vague laws may trap the innocent by not providing fair warning. Second, if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them. A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an *ad hoc* and subjective basis, with the attendant dangers of arbitrary and discrimina-

tory application. Third, but related, where a vague statute "abut[s] upon sensitive areas of basic First Amendment freedoms," it "operates to inhibit the exercise of [those] freedoms." Uncertain meanings inevitably lead citizens to "'steer far wider of the unlawful zone' ... than if the boundaries of the forbidden areas were clearly marked."

*Grayned v. City of Rockford,* 408 U.S. 104, 108–09, 92 S.Ct. 2294, 2298–99, 33 L.Ed.2d 222 (1972) (footnotes omitted). Under these criteria, §§ 502.6(b)(3) and (b)(5), both unquestionably are unconstitutionally vague.

Under § 502.6(b)(3), the Agency will not certify films that "by special pleading attempt generally to influence opinion" or "espouse a cause." The constitutional defects inherent in this language are obvious. First, what is "special pleading"? The Court, much less film producers, cannot begin to guess at its meaning. Next, by stating that films may not "attempt generally" to influence opinion, the regulation seems to suggest that some quantum of argumentative content is permissible. Indeed, it cannot mean otherwise, since some degree of subjectivity is inevitable in any material that purports to discuss various aspects of a topic. But where and how is the line to be drawn? The regulations set forth no objective criteria, leaving the decision to the subjective standards of the USIA. This is precisely the evil that the vagueness doctrine seeks to avoid. The regulation also rejects materials that "seem to attack" a persuasion. Assuming that one can figure out what a "persuasion" is, the term "seem to attack" is a classic example of a "broad invitation to subjective or discriminatory enforcement" that the Constitution forbids. 408 U.S. at 113, 92 S.Ct. at 2301.

Similarly, § 502.6(b)(5) rejects materials "which appear to have as their purpose or effect to attack or discredit economic, religious, or political views or practices." The words "appear to have as their purpose" could scarcely be more vague. Moreover, the term "discredit" is so imprecise that film makers must "steer far wider" of the forbidden zone. *Id.* at 109, 92 S.Ct. at 2299. This regulation also rejects material "which may lend itself to misinterpretation, or misrepresentation of the United States or other countries...." The phrase "may lend itself", like the phrase "seem to attack", is inherently incapable of objective application. Moreover, the phrase "misinterpretation or misrepresentation of the United States" is hopelessly unclear. How is one to determine what is "misrepresentative" of an open, diverse and pluralistic society as is the United States? In a nation that prides itself in the protection of the right to express unpopular ideas and the right to dissent, can the expression of such dissenting views ever be a "misrepresentation"?

The Court recognizes that "we can never expect mathematical certainty from our language", and that words may be marked by "flexibility and reasonable breadth, rather than meticulous specificity." *Id.* at 110, 92 S.Ct. at 2299 (quoting *Esteban v. Central Mo. State College,* 415 F.2d 1077, 1088 (8th Cir.1969), *cert. denied,* 398 U.S. 965, 90 S.Ct. 2169, 26 L.Ed.2d 548 (1970)). But these regulations are not merely "flexible"; they are boundless.

### (b) Content-Based Regulations

Generally, regulations that discriminate on the basis of the content of speech are not tolerated under the First Amendment. *Regan v. Time, Inc.,* 468 U.S. 641, 648–49, 104 S.Ct. 3262, 3266–67, 82 L.Ed.2d 487 (1984); *Police Dep't of Chicago v. Mosely,* 408 U.S. 92, 95–96, 92 S.Ct. 2286, 2289–90, 33 L.Ed.2d 212 (1972).[17] In the case at bench, however, the Agency obviously must undertake some inquiry into the content of an applicant's speech in order to

---

**17.** To the extent the Court has carved out any limited exceptions to the general prohibition against content-based regulation, those exceptions obviously are inapplicable here. *E.g., FCC v. Pacifica Found.,* 438 U.S. 726, 98 S.Ct. 3026, 57 L.Ed.2d 1073 (1978) ("indecent" speech); *Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n,* 447 U.S. 557, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980) (commercial speech).

determine whether the speech is "educational". The legitimacy of a classification such as "educational" has been recognized in other contexts. *E.g., Nat'l Alliance v. United States,* 710 F.2d 868 (D.C. Cir.1983) (Treasury regulations defining "educational" for purposes of federal tax exemptions); *Big Mama Rag, Inc. v. United States,* 631 F.2d 1030 (D.C.Cir.1980) (same). However, any limited inquiry into the content of the speech in such circumstances must be neutral as to viewpoint; discrimination on the basis of political or other beliefs is never tolerated. *See, e.g., Healy v. James,* 408 U.S. 169, 187–88, 92 S.Ct. 2338, 2349, 33 L.Ed.2d 266 (1972).

■ Here, plaintiffs correctly contend that §§ 502.6(b)(3) and (b)(5) discriminate on the basis of political content.[18] Section 502.6(b)(5), with its rejection of materials that "misrepresent" the United States, is certainly an impermissible content-based regulation. Indeed, this language is perhaps the most offensive of the entire regulatory scheme, because it places the government in the position of determining what is the "truth" about America, politically and otherwise. This, above all else, the First Amendment forbids:

> [I]t cannot be the duty, because it is not the right, of the state to protect the public against false doctrine. The very purpose of the First Amendment is to foreclose public authority from assuming a guardianship of the public mind through regulating the press, speech and religion. In this field every person must be his own watchman for truth, because the forefathers did not trust any government to separate the truth from the false for us.

*Thomas v. Collins,* 323 U.S. 516, 545, 65 S.Ct. 315, 329, 89 L.Ed. 430 (1945) (Jackson, J. concurring).

As for § 502.6(b)(3), plaintiffs argue that because the regulation prohibits the certification of materials that state a point of view, it impermissibly limits expressions of opinion on issues of public controversy, contrary to *Consolidated Edison Co. v. Public Serv. Comm'n,* 447 U.S. 530, 100 S.Ct. 2326, 65 L.Ed.2d 319 (1980), and *FCC v. League of Women Voters,* 468 U.S. 364, 104 S.Ct. 3106, 82 L.Ed.2d 278 (1984). The Court agrees. Here, as in *League of Women Voters,* the challenged regulation is "specifically directed at a form of speech—namely, the expression of editorial opinion—that lies at the heart of First Amendment protection." *Id.* at 381, 104 S.Ct. at 3118. This protection is not limited to "editorial" opinion. The Supreme Court clearly has held in other contexts that "expression on public issues 'has always rested on the highest rung on the hierarchy of First Amendment values.'" *NAACP v. Claiborne Hardware Co.,* 458 U.S. 886, 913, 102 S.Ct. 3409, 3425, 73 L.Ed.2d 1215 (1982) (quoting *Carey v. Brown,* 447 U.S. 455, 467, 100 S.Ct. 2286, 2293, 65 L.Ed.2d 263 (1980)). *See also Consolidated Edison,* 447 U.S. 530, 100 S.Ct. 2326. Although the justification for this strict protection rests in part on the necessity for maintaining an informed public in a democracy, *e.g., Carey v. Brown,* 447 U.S. at 467, 100 S.Ct. at 2293 (speech concerning public affairs is more than self-expression; it is the essence of self-government), that does not alter the analysis here. The Court already has established that the First Amendment applies abroad. Thus, the government obviously could not constitutionally prohibit, say, an

---

**18.** It should be noted that when an enactment involves content-based regulation, it may be analyzed under equal protection principles. *E.g., Police Dep't of Chicago v. Mosely,* 408 U.S. at 94–95, 92 S.Ct. at 2289. However, in such cases, equal protection interests are "closely intertwined with First Amendment interests." *Id.* The Court concludes that the result in this case would not differ if equal protection analysis were employed. Speech undoubtedly is a fundamental right; thus, the regulations at issue here are subject to strict judicial scrutiny. The government, therefore, must show it has a substantial interest supporting the challenged classification and that the classification is narrowly drawn to serve that interest. *San Antonio School Dist. v. Rodriguez,* 411 U.S. 1, 40, 93 S.Ct. 1278, 1300, 36 L.Ed.2d 16 (1973). Here, as discussed above, the government's asserted interests are not substantial enough to justify content-based discrimination.

American professor of political science from expressing his or her opinions before an international symposium in Paris on the ground that his or her foreign listeners do not participate in the American political process. To paraphrase the passage from *Carey v. Brown:* Speech concerning public affairs is more than a tool of self-government; it is also an essential form of self-expression.

■ There is another reason why the denial of certification of films that present "points of view" offends the Constitution. Our nation considers the free exchange of ideas and viewpoints to be central to the *educational* process:

> Our Nation is deeply committed to safeguarding academic freedom, which is a transcendent value to all of us and not merely to the teachers concerned. That freedom is therefore a special concern of the First Amendment, which does not tolerate laws that cast a pall of orthodoxy over the classroom.

*Keyishian v. Board of Regents,* 385 U.S. 589, 603, 87 S.Ct. 675, 683, 17 L.Ed.2d 629 (1967). Thus, any definition of "educational" that is constitutionally acceptable *must* accomodate materials that purport to reach a conclusion or take a stand.

### 4. *Constitutionality of § 502.6(a)(3)*

Section 502.6(a)(3) is the regulation that mirrors the Treaty's definition of "educational". It is apparent to the Court that this regulation also is facially inconsistent with the First Amendment because it is vague and requires non-neutral content examination.[19]

■ First, as to vagueness, § 502.-6(a)(3) states that material will not be considered "educational" unless it "augment[s] international understanding and goodwill." This phrase does not "give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly." *Grayned,* 408 U.S. at 108, 92 S.Ct. at 2298. The Agency argues that *it* possesses the expertise fairly to determine what types of materials will "augment international goodwill". This argument only reinforces the fact that the regulation's uncertainty means that the Agency is free to base its decisions on prohibited grounds.

Next, § 502.6(a)(3) requires materials to be "representative, authentic and accurate." Little need be said about the constitutional infirmities of each of these words. There simply are no standards by which a film maker can ascertain how the USIA will apply these standards to his or her film. If the film maker presents two sides of an issue, is that enough to be "authentic" or "accurate"? Or must he or she attempt to cover all conceivable aspects of any given topic? Similarly, although he or she knows that his or her film must be "representative", the obvious questions, to which no one but the USIA has the answers, are "representative" of what? Or of whom?

■ The regulation also discriminates on the basis of content. In particular, the requirement that material be "accurate" is improper. A determination concerning the accuracy of a film "cannot help but be based on the content of the [film] and the message it delivers." *Regan v. Time, Inc.,* 468 U.S. at 648, 104 S.Ct. at 3266. Moreover, the "accuracy" requirement, like § 502.6(b)(5), places the government in the position of determining the truth, and thus cannot be tolerated.

It is clear, therefore, that § 502.6(a)(3) is

---

**19.** As stated, plaintiffs do not challenge the facial validity of § 502.6(a)(3). However, in the circumstances here, the as applied challenge cannot be distinguished from a facial challenge. A facial challenge means that the regulation could never be applied in a valid manner. *Members of the City Council v. Taxpayers for Vincent,* 466 U.S. 789, 796–98, 104 S.Ct. 2118, 2124–25, 80 L.Ed.2d 772 (1984). Thus, on an undisputed record as we have here, both species of challenge—facial and as applied—are questions of law which may be freely addressed. *Id.* at 796. Therefore, the Court will proceed *sua sponte* with a facial analysis of this regulation. *See also Celotex Corp. v. Catrett,* —— U.S. ——, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986).

unconstitutional on its face.[20] Because the regulation employs the very words of the Treaty, it may be argued that the Treaty itself also must be unconstitutional. However, no attack is made against the constitutionality of the Treaty itself. For obvious prudential reasons, the Court declines to make such inquiry *sua sponte*. The Beirut Agreement clearly benefits not only the United States but the world community as well. Striking down the Treaty would only bestow hardships on the owners of the thousands of materials that otherwise would be certificated each year. And plaintiffs obviously are seeking no such Pyrrhic victory. Accordingly, I now briefly explore the question of whether regulations that are consistent with both the Constitution and the Treaty can be devised.

### D. RESOLVING THE TENSIONS BETWEEN THE TREATY AND THE CONSTITUTION

The Court is not unsympathetic to the USIA's position. Under any circumstances, defining the word "educational" in a regulatory context would be an extremely difficult task because "[w]ords such as ... 'educational' easily lend themselves to subjective definitions at odds with ... constitutional limitations." *Big Mama Rag*, 631 F.2d at 1035. Nonetheless, it appears that it may be possible for the Agency to develop constitutionally acceptable guidelines. For example, the IRS apparently has developed a "Methodology Test" for determining if organizations qualify as "educational" under 26 U.S.C. § 501(c)(3). This test, which makes room for materials that state a point of view, focuses on the reasoned development of the conclusions stated in the material by looking to the "method by which the advocate proceeds from the premises he furnishes to the conclusion he

advocates rather than the truth or accuracy or general acceptance of the conclusion." *National Alliance*, 710 F.2d at 874.[21] The Court expresses no view as to whether the Methodology Test or any other guideline would cure the constitutional deficiencies found in the present regulations. I refer to that test solely to illustrate that it may be feasible for the Agency to develop constitutionally acceptable criteria.

The Court does believe, however, that a constitutionally acceptable definition of "educational" could fit comfortably within the broad definition of that term set out in Article I of the Treaty. First, it is clear that if the Agency continues blindly to adhere to the Treaty's express language, it will not be able to fashion constitutional regulations. However, as explained below, the Agency's regulations need not parrot the Treaty's language.

As stated, the Treaty is not self-implementing. Thus, " '[when] a treaty is not self-executing it is not the treaty but the implementing legislation that is effectively' law of the land." *Hopson v. Kreps*, 622 F.2d 1375, 1380 (9th Cir.1980) (citation omitted). Moreover, "[t]he issue in any legal action concerning a statute implementing a treaty is the intended meaning of the terms of the statute. The treaty has no independent significance in resolving such issues, but is relevant insofar as it may aid in the proper construction of the statute." *Id.* Under these principles, it is clear that the definition of "educational" in Article I of the Treaty simply sets out the broad guidelines each signatory nation should consider in implementing the Beirut Agreement.

This is a sensible conclusion. Although the wording of the Treaty may be unconsti-

---

**20.** In light of the determination that § 502.-6(a)(3) is facially unconstitutional, I need not reach the questions of whether the USIA certification decisions are non-justiciable political questions under the criteria of *Baker v. Carr*, 369 U.S. 186, 217, 82 S.Ct. 691, 710, 7 L.Ed.2d 663 (1962), or reviewable under the APA. As previously mentioned, defendants raise those issues only with respect to plaintiffs' "as ap-

plied" claims. The Court expresses no opinion on those issues which are now mooted.

**21.** It is unclear whether the Methodology Test still is in use; the court in *National Alliance* did not need to decide whether the test is constitutionally sufficient (although the court seemed to express at least tentative approval). *Id.* at 875–76.

tutional, the Treaty's drafters were not obligated to choose language with the United States Constitution in mind. Multilateral treaties by their nature must accomodate the interests of nations with diverse political systems. Moreover, because the Treaty is not self-implementing, it permits each nation to fashion an implementing scheme best adapted to that nation's own domestic circumstances. In this country, Congress, through the President, charged the USIA with reading some specific meaning into the Treaty's broad guidelines by issuing appropriate regulations, including a suitable definition of "educational." Obviously, however, those regulations must comply with the Constitution.

In reconciling constitutional principles with the Treaty's broad requirements, it first is apparent that the Treaty's general requirement in Article I, that educational material must "augment international good will" should pose no problems. It is difficult to see how materials that are deemed to be educational under constitutional criteria would impede international understanding. Indeed, as indicated in its prefatory statement, the Treaty itself assumes that merely by facilitating the free flow of *all* educational material, the mutual understanding of peoples will of necessity be encouraged. Thus, the requirement that educational material must "augment international good will" poses no impediment to fashioning a constitutional definition of "educational." The Court acknowledges that there may be material that purports to be educational but which is so patently offensive or inflamatory that it would hinder rather than promote international understanding. However, such material is likely not to comport with any reasonable definition of "educational" and thus would not need to be certified. *See, e.g., National Alliance*, 710 F.2d at 873 (white supremacist "hate literature" not educational within any definition conceivably intended by Congress). The Treaty clearly is flexible enough to accomodate this approach, since the Treaty permits importing nations to override the certification decisions of the exporting country. Thus, any "borderline" material that must be certified as educational under American constitutional standards can be rejected by nations with more restrictive standards.

As for the requirement that educational material be "representative, authentic and accurate", those words are, as previously discussed, simply broad guidelines. An approach such as the Methodology Test would substantially comport with those guidelines since such a test would require any viewpoints expressed in the materials to be supported by a "relevant factual basis"; moreover, the underlying facts may not be distorted. *See National Alliance*, 710 F.2d at 874. Again, however, the Court emphasizes that it is expressing no view on the Methodology Test or whether that particular approach would satisfy the Treaty's requirements.

### E. UNLAWFUL DELEGATION

█ The third claim alleges that the Agency illegally delegates its certification authority under the Treaty to "non-neutral outside government agencies...." (Comp. ¶ 82.)

As previously stated, the statute expressly authorizes inter-agency consultation, P.L. 89–634, § 2; as does § 502.4 of the regulations. Such inter-agency consultation apparently took place with respect to two films. *Our Own Backyards* was reviewed by the Department of Energy and *From the Ashes* was reviewed by the State Department. The record indicates that the certification decisions respecting both of these films were made in accordance with the three-step Agency procedure of §§ 502.3(g), 502.5(b) & (c). Plaintiffs' briefs speak not of delegation, but of "abdication." Putting aside the word's perjorative content, the assertion is nothing more than one of deference or acceptance. There is no evidence of "delegation." Summary judgment must be granted to defendants on this claim. *Celotex Corp. v. Catrett*, — U.S. ——, 106 S.Ct. 2548, 2553–54, 91 L.Ed.2d 265 (1986).

## III. CONCLUSION

The Court appreciates the USIA's delicate position in carrying out its mandate to implement the Beirut Agreement, consistent with the Constitution. However, the Agency's Treaty obligation to certify only what is "educational", simply may not, consistent with the Constitution, place the USIA in the position of a censor. The District of Columbia Circuit's recent decision in *Block v. Meese*, 793 F.2d 1303 (D.C. Cir.1986) (Scalia, J.), is not to the contrary. There, the court upheld the classification of three films produced by the National Film Board of Canada as "political propaganda" under the Foreign Agents Registration Act ("FARA"), 22 U.S.C. § 611 *et seq.* The court found that the classification did not interfere with any First Amendment rights because at most, it "constituted an expression of official government disapproval of the ideas in question," *id.* at 1312, which does not in itself offend the Constitution because the government has the right to "add its own voice to the many it must tolerate." *Id.*, at 1314 (quoting L. Tribe, *American Constitutional Law*, 588, 590 (1978)).[22] The court thus based its decision on the following distinction:

> The line of permissibility, we think, falls ... between ... the *disparagement* of ideas ... and the *supression* of ideas *through the exercise or threat of state power.*

*Id.* (emphasis added).

As is apparent, the case at bench is entirely different from *Block v. Meese.* Here, the government has gone far beyond the mere disparagement of plaintiffs' films; rather, the government has exercised its power to deny a tangible benefit to plaintiffs because, in the government's view, their films could be construed to be "propagandistic" rather than "educational." The District of Columbia Circuit strongly indicated that, on these facts, it too would conclude that the USIA regulations are unconstitutional:

It may well be that threat and thus suppression would be the consequence of a scheme for systematic review of books and films by an official evaluator, in order that the government may label their content approved or condemned.

*Id.*

In sum, the Court concludes that the USIA reviewed plaintiffs' films under unconstitutional criteria. However, the Court believes that the Agency may be capable of discharging the United States' obligation under the Beirut Agreement, while at the same time complying with the Constitution. Therefore, it would be imprudent at this time to order the Agency to issue certificates to plaintiffs' films without first affording the Agency an opportunity to reevaluate the films under constitutional standards. Therefore,

IT IS ORDERED:

1. Defendants' motion to dismiss is denied.

2. Defendants' motion for summary judgment with respect to the illegal delegation claim is granted; with respect to facial validity of the USIA regulations is denied; in all other respects the motion is rendered moot.

3. Plaintiffs' motion for summary judgment on their first claim is granted.

4. The Court, *sua sponte*, grants summary judgment to plaintiffs with respect to the facial invalidity of § 502.6(a)(3).

5. Summary judgment shall be entered for plaintiffs:

(a) Declaring §§ 502.6(a)(3), 502.6(b)(3) and 502.6(b)(5) of the USIA's regulation governing the "World-Wide Free Flow of Audio-Visual Materials" to be invalid and permanently enjoining defendants from enforcing said regulations and denying "educational" certificates to any film under the Beirut Agreement, based on said regulations;

(b) Ordering the USIA to reconsider the eligibility of each of the films *Our Own*

---

**22.** *But see Keene v. Meese,* 619 F.Supp. 1111 (E.D.Cal.1985) (holding that FARA abridged First Amendment), *prob. juris. noted,* — U.S. ——, 106 S.Ct. 1632, 90 L.Ed.2d 178 (1986).

*Backyards, Peace, Childhood, Save the Planet, Ecocide* and *From the Ashes* for certification under the Beirut Agreement under standards consistent with the First and Fifth Amendments.